NATIONAL ASSOCIATION FOR the ADVANCEMENT OF COLORED PEOPLE, Lansing Branch, Cynthia Taylor, Judith Taylor and Andrea Taylor, by their father and Next Friend, James R. Taylor, Melinda Lea Hedley, Christine Michele Hedley, Douglas John Hedley and Daniel Joseph Hedley, by their mother and Next Friend, Joan L. Hedley, Peter Miller and Elizabeth Miller, by their father and Next Friend, Charles Miller, Frank J. Pennoni and James Pennoni, by their mother and Next Friend, Kathleen Pennoni, and David Kron and Lisa Kron, by their father and Next Friend, Walter V. Kron, Plaintiffs-Appellees,

v.

LANSING BOARD OF EDUCATION, a body corporate, and Members of the Lansing Board of Education, viz., Vernon D. Ebersole, Clare D. Harrington, Michael F. Walsh, Ray A. Hannula, Joan Hess, J. C. Williams, Bruce Angell, Joseph E. Hobrla and Max D. Shunk, Defendants-Appellants.

No. 76–1267.

United States Court of Appeals, Sixth Circuit.

Argued April 21, 1977.

Decided July 26, 1977.

1044

Fred C. Newman, Newman & Mackay, Lansing, Mich., for defendants-appellants.

John W. Davis, Lansing, Mich., for plaintiffs-appellees.

Before CELEBREZZE, PECK and LIVELY, Circuit Judges.

CELEBREZZE, Circuit Judge.

The Board of Education and its individual members appeal from a finding of liability in a suit brought to desegregate public elementary schools in Lansing, Michigan. The suit was brought as a class action by the National Association for the Advancement of Colored People (NAACP) and by children and parents of children who are elementary students in the Lansing school system. Chief Judge Noel P. Fox of the Western District of Michigan, Southern Division, found that the Lansing School Board, through its acts and omissions, has created and maintained a racially segregated school system. The District Court enjoined the School Board from enforcing resolutions of February 1, 1973, rescinding a voluntary cluster-school desegregation plan instituted on June 29, 1972. The Court ordered that the cluster plan for desegregating Lansing's elementary schools remain in effect until a final remedy is submitted by the Board and approved by the Court. Appellants raise three issues on appeal: whether the District Court applied an incorrect legal standard; whether the Court's findings of fact are clearly erroneous; and whether the Board of Education was denied a fair trial. For the reasons stated below, we affirm.

■ In the landmark case of *Brown v. Board of Education*, 347 U.S. 483, 495, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (*Brown* I), the Supreme Court overruled the "separate-but-equal" doctrine of *Plessy v. Ferguson*, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896), and held that racially segregated public education facilities are inherently unequal and that children who are forced to attend segregated schools are denied the equal protection of laws in violation of the Fourteenth Amendment. But to be violative of the Fourteenth Amendment, the racial segregation in public schools must result from some form of state action and not from factors, such as residential housing patterns, which are beyond the control of state officials.[1] *See Swann v. Board of Education*, 402 U.S. 1, 17–18, 91 S.Ct. 1267,

28 L.Ed.2d 554 (1971). Where a dual educational system was authorized by state law at the time of *Brown* I, finding state action presents no serious problem. The state automatically assumes an affirmative duty "to effectuate a transition to a racially non-discriminatory school system," *Brown v. Board of Education*, 349 U.S. 294, 301, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1955) (*Brown* II), by eliminating "all vestiges of state-imposed segregation." *Swann v. Board of Education*, 402 U.S. at 15, 91 S.Ct. at 1275. *See also Green v. County School Board*, 391 U.S. 430, 437–38, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). The problem of finding state action is more acute, however, in northern school districts which do not have a history of statutorily authorized segregated schools. *See Keyes v. School District No. 1*, 413 U.S. 189, 201, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973). However, even in school districts which purport to be unitary, unlawful segregation exists where "school authorities have carried out a systematic program of segregation affecting a substantial portion of students, schools, teachers, and facilities within the school system . . . ." *Keyes v. School District No. 1*, 413 U.S. at 201, 93 S.Ct. at 2694. In *Keyes* the Supreme Court distinguished between de facto and de jure segregation. De jure segregation was defined as "a current condition of segregation resulting from intentional state action directed specifically [at] the [segregated] schools." *Id.* at 205–06, 93 S.Ct. at 2696. The *Keyes* Court stressed that the differentiating factor between de jure and de facto segregation is the "purpose or intent to segregate." *Id.* at 208, 93 S.Ct. 2686. The distinction between de facto and de jure segregation has been criticized and its abandonment has been urged. *See Keyes v. School District No. 1*, 413 U.S. at 216, 93 S.Ct. 2686. (Douglas, J., concurring); *id.* at 219–36, 93 S.Ct. 2686 (Powell, J., concurring in part, dissenting in part). In *Cisneros v. Corpus Christi Independent School District*, 467 F.2d 142, 148 (5th Cir. 1972), the Fifth Circuit rejected the de

---

1. Local school boards are agents of the state for purposes of the Fourteenth Amendment.

*Cooper v. Aaron*, 358 U.S. 1, 16, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958).

facto/de jure dichotomy and held that all that need be shown to establish illegal segregation is that official action had the discriminatory effect of denying equal educational opportunities to minority students. The "discriminatory effect" approach was, however, rejected in *Washington v. Davis,* 426 U.S. 229, 240, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), when the Supreme Court reaffirmed the de facto/de jure distinction recognized in *Keyes.* *See also Austin Independent School District v. United States,* 429 U.S. 990, 97 S.Ct. 517, 50 L.Ed.2d 603 (1977).[2] In *Washington v. Davis,* 426 U.S. at 240, 96 S.Ct. 2040, the Supreme Court cites *Keyes* for the proposition that a showing of "racially discriminatory purpose" is required in all equal protection cases.[3]

■■■■ Appellants contend that *Washington v. Davis* and *Austin Independent School District v. United States* require reversal of the lower court's decision because Judge Fox relied on the now-discredited "discriminatory effect" test in evaluating the Board's conduct. We reject this contention. In his opinion, Judge Fox explicitly adopted a test dependent on purposeful segregation by public school officials. While mentioning that the Fifth Circuit had re-

jected the de jure/de facto dichotomy in *Cisneros v. Corpus Christi Independent School District,* Judge Fox expressly followed the Supreme Court's lead in *Keyes* and assumed that de jure segregation was required to support a finding of constitutional violation, preferring to leave to future adjudication the question of whether something other than de jure segregation constitutes a violation of the Fourteenth Amendment. In finding Appellees guilty of acts of de jure segregation, the District Court applied the standards we announced in *Oliver v. Michigan State Board of Education,* 508 F.2d 178, 182 (6th Cir. 1974):

A finding of de jure segregation requires a showing of three elements: (1) action or inaction by public officials (2) with a segregative purpose (3) which actually results in increased or continued segregation in the public schools. A presumption of segregative purpose arises when plaintiffs establish that the natural, probable, and foreseeable result of public officials' action or inaction was an increase or perpetuation of public school segregation. The presumption becomes proof unless defendants affirmatively es-

---

**2.** In *Austin Independent School District v. United States,* 429 U.S. 990, 97 S.Ct. 517, 50 L.Ed.2d 603 (1977), the Supreme Court vacated the Fifth Circuit's decision in *United States v. Texas Education Agency,* 532 F.2d 380 (5th Cir. 1976), and remanded "for reconsideration in light of *Washington v. Davis.*" In *United States v. Texas Education Agency,* 532 F.2d at 387, the Fifth Circuit adhered to its previous ruling in *Cisneros v. Corpus Christi Independent School District, supra,* that all that need be shown for actionable segregation is a cause and effect relationship between state action and the racial and ethnic segregation of public school students. The Fifth Circuit expressly held that where "discriminatory effect" is shown, there is no need to prove discriminatory intent. *Id.* The remand in *Austin Independent School District v. United States* signals a disavowal of the Fifth Circuit's discriminatory effect approach to school desegregation and a reaffirmance of the concept of de jure segregation as defined in *Keyes* and reiterated in *Washington v. Davis. See Dayton Board of Education v. Brinkman,* —— U.S. ——, ——, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977).

We note in passing, however, that Justice Powell in a concurring opinion to the *Austin*

case stated that in an earlier. stage of the case "findings were made which evidenced segregative intent, *see, e. g., United States v. Texas Education Agency,* 467 F.2d 848, 865–869 (C.A. 5 1972)." The findings to which Justice Powell referred related to the Fifth Circuit's holding that the school board by "its choice of school site location, construction and renovation of schools, drawing of attendance zones, student assignment and transfer policies, and faculty and staff assignments, caused and perpetuated the segregation of Mexican-American students within the school system." 467 F.2d at 865–66 (footnotes omitted). Similar policies by the Lansing Board of Education were the bases for the District Court's finding of de jure segregation in this case.

**3.** The more rigorous "discriminatory effect" test is still applicable to causes of action based on statutory rights rather than on constitutional grounds, for example, those granted under Title VII of the Civil Rights Act of 1964. *See Washington v. Davis,* 426 U.S. at 238–39, 247–48, 96 S.Ct. 2040. *But cf. Trans World Airlines, Inc. v. Hardison,* —— U.S. ——, ——, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977).

tablished that their action or inaction was a consistent and resolute application of racially neutral policies. (footnote omitted)

Appellants claim that our reference in *Oliver* to the inference of segregated purpose from "the natural, probable, and foreseeable result of public officials' action or inaction" was an adoption of the "discriminatory effect" test repudiated in *Washington v. Davis* and *Austin Independent School District v. United States.* On two previous occasions, we have rejected similar arguments. *Bronson v. Board of Education,* 525 F.2d 344, 348 (6th Cir. 1975); *Higgins v. Board of Education,* 508 F.2d 779, 790–91 (6th Cir. 1974). As we noted in *Bronson v. Board of Education,* 525 F.2d at 348, the correct reading of *Oliver* is that the Court did not dispense with the requirement that segregative intent or purpose be proven, but rather held that the required intent could be inferred from acts and policies of school authorities which had the natural and foreseeable effect of producing segregated schools. This is not a novel position. *See, e. g., United States v. School District of Omaha,* 521 F.2d 530, 535–36 (8th Cir. 1975), *vacated on other grounds,* —— U.S. ——, 97 S.Ct. 2905, 53 L.Ed.2d 1039 (1977) (per curiam); *Hart v. Community School Board of Education,* 512 F.2d 37, 50–51 (2d Cir. 1975); *Morgan v. Kerrigan,* 509 F.2d 580, 588–89 (1st Cir. 1974). Nor is it inconsistent with the principle of de jure segregation enunciated in *Keyes* and reiterated in *Washington v. Davis.* See *Armstrong v. Brennan,* 539 F.2d 625, 634–35 (7th Cir. 1976), *vacated on other grounds,* —— U.S. ——, 97 S.Ct. 2907, 53 L.Ed.2d 1044 (1977) (per curiam). In *Washington v. Davis* the Supreme Court admitted that "[n]ecessarily, an invidiously discriminatory purpose may often be inferred from the totality of relevant facts, including the fact, if it is

true, that the law bears more heavily on one race than another. . . . Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution." 426 U.S. at 242, 96 S.Ct. at 2049. The majority's reference to the necessity or proving segregative intent from the totality of the circumstances was amplified by Justice Stevens in his concurring opinion:

> Frequently the most probative evidence of intent will be objective evidence of what actually happened rather than evidence describing the subjective state of mind of the actor. For normally the actor is presumed to have intended the natural consequences of his deeds. This is particularly true in the case of governmental action which is frequently the product of compromise, of collective decisionmaking, and of mixed motivation. It is unrealistic, on the one hand, to require the victim of alleged discrimination to uncover the actual subjective intent of the decisionmaker or conversely, to invalidate otherwise legitimate action simply because an improper motive affected the deliberation of a participant in the decisional process. A law conscripting clerics should not be invalidated because an atheist voted for it.

*Washington v. Davis,* 426 U.S. at 253, 96 S.Ct. at 2054 (Stevens, J., concurring). *See also Village of Arlington Heights v. Metropolitan Housing Development,* 429 U.S. 252, 97 S.Ct. 555, 564–65, 50 L.Ed.2d 450 (1977).[4] Indeed, it would be difficult, and nigh impossible, for a district court to find a school board guilty of practicing de jure segregation, unless the court is free to draw an inference of segregative intent or purpose from a pattern of official action or inaction which has the natural, probable and foreseeable result of increasing or perpetuating

---

4. In *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. at 264–68, 97 S.Ct. at 563–65, the Supreme Court discussed its recent decision in *Washington v. Davis* and elaborated on the nature of the "discriminatory purpose" required for de jure segregation and various methods of proving segregatory intent. The Court noted that the intent

to discriminate need not be the "dominant" or "primary" purpose for the official action, but "[w]hen there is proof that a discriminatory purpose has been a motivating factor in the decision" the scienter element of de jure segregation is proven. 429 U.S. at 265, 97 S.Ct. at 563.

school segregation.[5] *See Oliver v. Michigan State Board of Education,* 508 F.2d at 182–83; *United States v. School District of Omaha,* 521 F.2d at 535–37; *Hart v. Community School Board,* 512 F.2d at 50. Until the Supreme Court instructs us to the contrary, we will adhere to the mandate of *Keyes* and uphold a district court's finding of de jure segregation wherever it is apparent from objective evidence in the record that school authorities have carried out a "systematic program of school segregation," which has, in effect, created a "dual school system." 413 U.S. at 201, 93 S.Ct. 2686.[6]

The District Court found that the Lansing Board of Education had practiced de jure segregation in the administration of the elementary school system.[7] In making this finding, the District Court focused on a number of acts and policies of the school board held to evidence de jure segregation, including policies relating to attendance boundaries, medical transfers, mobile units, maintenance of physical facilities, one-way busing of black children, and faculty hiring and assignments. The Court also inferred

segregative intent from the Board's rescission of the "cluster plan" for desegregating the elementary schools and the construction and intended use of a new elementary school to be located in a heavily black area. Appellants urge that the District Court's findings are clearly erroneous. They assert that attendance at Lansing elementary schools is determined according to a "neighborhood school" policy and attribute the existence of racially identifiable schools to segregated residential patterns, rather than to practices and policies of the Board of Education. For this reason, Appellants claim that the District Court erred in holding that the school board had an affirmative duty to desegregate the elementary schools. Appellees in rebuttal, point to specific acts of the school board which the Court found to be acts of de jure segregation and which contributed significantly to the segregated condition of the public elementary schools. Appellees contend that the long history of discrimination in Lansing's public schools imposes a duty on the

---

5. In *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. at 265–66 & nn. 11, 12, 97 S.Ct. at 563 & nn. 11, 12, the Supreme Court alluded to the inherent difficulties in determining the collective motivation of a legislative or administrative body. *See Palmer v. Thompson,* 403 U.S. 217, 224–25, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971); *Keyes v. School District No. 1,* 413 U.S. at 233–34, 93 S.Ct. 2686 (Powell, J., concurring). *See also Oliver v. Michigan State Board of Education,* 508 F.2d at 182–83; *Hart v. Community School Board,* 512 F.2d at 50.

6. In *Dayton Board of Education v. Brinkman,* —— U.S. ——, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977), the Supreme Court vacated our decision in *Brinkman v. Gilligan,* 539 F.2d 1084 (6th Cir. 1976), and remanded the case for reconsideration of the scope of the remedy ordered. The Supreme Court held that the constitutional violations found by the District Court and upheld on appeal by this Court were not sufficiently extensive on their face to justify a systemwide remedy. On remand, the Supreme Court directed the District Court, subject to review by this Court, to "determine how much incremental segregative effect these violations had on the racial distribution of the Dayton school population as presently constituted, when that distribution is compared to what it would have been in the absence of such constitutional violations. The remedy must be designed to re-

dress that difference, and only if there has been a system-wide impact may there be a system-wide remedy." —— U.S. ——, 97 S.Ct. 2768. At the same time and for the same reason, the Supreme Court vacated the decisions of the Eighth Circuit in *School District of Omaha v. United States,* 541 F.2d 708 (8th Cir. 1976), *vacated and remanded,* —— U.S. ——, 97 S.Ct. 2905, 53 L.Ed.2d 1039 (1977), and of the Seventh Circuit in *Brennan v. Armstrong,* 539 F.2d 625 (7th Cir. 1976), *vacated and remanded,* —— U.S. ——, ——, 97 S.Ct. 2907, 53 L.Ed.2d 1044 (1977). While these decisions will have a profound impact at the remedy stage of this case, they do not directly effect the District Court's findings of liability or our affirmance of those findings. If anything, the Supreme Court's express application of *Washington v. Davis* to a school desegregation case reaffirms the District Court's conclusion that only de jure segregation, as that term was defined in *Keyes,* offends the constitution and triggers a duty on the part of school officials to remedy the violation. *See also Milliken v. Bradley,* —— U.S. ——, ——, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977).

7. Lansing secondary schools were integrated in 1966 pursuant to a plan adopted by the Board of Education. *See Jipping v. Lansing School District,* 15 Mich.App. 441, 166 N.W.2d 472 (1968).

Board of Education to take affirmative steps to alleviate segregation in the elementary schools. Thus, the argument divides along familiar lines. The Board invokes the sanctity of neighborhood schools while the class representatives claim that the "neighborhood school" policy was unfairly manipulated to justify containment of minority students in segregated schools.

 As a matter of general principle, assigning school children to schools in their neighborhoods does not offend the constitution. *See, e. g., Higgins v. Board of Education,* 508 F.2d at 790; *Deal v. Cincinnati Board of Education,* 419 F.2d 1387 (6th Cir. 1969); *Deal v. Cincinnati Board of Education,* 369 F.2d 55 (6th Cir. 1966). Racial imbalance in the schools does not, in itself, establish a constitutional violation.[8] *See Keyes v. Denver School District No. 1,* 413 U.S. at 212, 93 S.Ct. 2686. *See also Bronson v. Board of Education,* 525 F.2d at 347. The Constitution imposes no duty on school officials to correct segregative conditions resulting from factors over which they have no control, such as residential patterns, and the failure to anticipate the effect on racial composition of the schools of adherence to a neighborhood school policy does not signify that a school board has created a dual system, absent a showing of segregative intent. *Higgins v. Board of Education,* 508 F.2d at 791. However, "the mere assertion of [a 'neighborhood school'] policy is not dispositive where . . . the school authorities have been found to have practiced *de jure* segregation in a meaningful portion of the school system by techniques that indicate that the 'neighborhood school' concept has not been maintained free of ma-

nipulation."[9] *Keyes v. School District No. 1,* 413 U.S. at 212, 93 S.Ct. at 2699. With the above in mind, we will now review the District Court's findings of fact to determine whether they are clearly erroneous. *See Dayton Board of Education v. Brinkman,* —— U.S. at ——, 97 S.Ct. 2766; *Oliver v. Michigan State Board of Education,* 508 F.2d at 182.

 The District Court made a finding that most blacks lived on the west side of Lansing, in a region commonly known as the "River Island" area.[10] Following a familiar demographic pattern, in the 1950's black people moved into previously white neighborhoods with a corresponding change in the racial composition of elementary schools in the area. The focal points of many of the Court's findings are four elementary schools—Main, Michigan, Kalamazoo and Verlinden. The District Court found that in the late 1950's the Board of Education deliberately froze attendance zone boundaries to contain black students within predominantly black schools, while altering the attendance zone boundaries between the white Verlinden service area and the black Michigan and Kalamazoo service areas in a manner which "had the foreseeable effect of increasing the racial identifiability of Michigan Avenue School." By 1957, the Board of Education was aware that certain elementary schools, notably the Main Street School, were becoming totally segregated and that certain boundary changes would be necessary to alleviate the conditions. Boundary changes between Main, Michigan and Verlinden could have decreased the racial identifiability of these

---

8. It is, however, significant evidence of de jure segregation. See *Washington v. Davis,* 426 U.S. at 242, 96 S.Ct. 2040; *Village of Arlington Heights v. Metropolitan Housing Development Board,* 429 U.S. at 266, 97 S.Ct. at 564.

9. The racial composition of neighborhood schools often influences residential patterns within the school district. Acts of de jure segregation "may have a profound reciprocal effect on the racial composition of residential neighborhoods within a metropolitan area, thereby causing further racial concentration

within the schools." *Keyes v. School District No. 1,* 413 U.S. at 202, 93 S.Ct. at 2694. *See also Swann v. Board of Education,* 402 U.S. at 20–21, 91 S.Ct. 1267.

10. The District Court found that, despite its name, the River Island area "is by no means an island, geographically isolated from other parts of the school district. To the contrary, it comprises the city's central business district and the State Capitol, and is readily accessible from all other parts of the city."

schools. Such changes were requested in 1957 by a committee appointed at the instigation of parents of black students at Main. The Board of Education rejected the boundary changes suggested by the committee, explaining that alteration of the boundaries would require children to "travel unreasonably long distances." The Board of Education also initially rejected a request by white parents living in the Main Street School service area to change the boundary lines to enable their children to attend Verlinden School. In September, 1957, the Board of Education did change the boundaries between Michigan, Verlinden and Kalamazoo for the stated purpose of "balancing enrollment." The boundary changes took an all-white area from Michigan, which was becoming increasingly black, and transferred it to Verlinden, which was white, and at the same time a black area was transferred from the Kalamazoo service area to Michigan. The District Court found that the boundary changes "had the foreseeable effect of increasing the racial identifiability of Michigan Avenue School and continuing the racial isolation of White Verlinden School." Since 1957, the Court noted that the Board has ignored repeated opportunities and requests to re-examine the attendance zone boundaries. The District Court discounted reasons given by the Board for the 1957 boundary decisions. The Board refused to adjust the boundaries between the Main and Verlinden schools because it found the distances prohibitive, yet the Court found that many of the distances involved were well within the distance approved by the Board for students walking to school. The stated purpose of the 1957 boundary changes was to "balance enrollment" between Michigan, Verlinden and Kalamazoo. However, the Court noted that what actually happened was that Michigan, where enrollment was below capacity, had no apparent net change in the size of its service area. The real effect of the boundary change on Michigan was to remove an all-white neighborhood from its service area and replace it with a black area, thereby accelerating segregation at the school. At-

tendance zone alterations which have the effect of exacerbating racial imbalance and isolation are probative of segregative intent. *Keyes v. School District No. 1*, 413 U.S. at 201, 93 S.Ct. 2686; *Oliver v. Michigan State Board of Education*, 508 F.2d at 184; *Bradley v. Milliken*, 484 F.2d 215, 221–36 (6th Cir. 1973), *rev'd on other grounds*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974); *Davis v. School District*, 443 F.2d 573, 576 (6th Cir. 1971); *United States v. Board of School Commissioners*, 474 F.2d 81, 85–86 (7th Cir. 1973). We conclude that the District Court did not commit clear error in inferring segregative purpose from the Board's policies on attendance zone boundaries in the River Island area.

 The District Court also found purposeful segregation in the implementation of the Board of Education's special transfer policy. In 1957 a student transfer policy was adopted by the Board of Education which permitted students to transfer from neighborhood schools because of emotional need if the transfer request was accompanied by the statement of a physician. The Court found that the special transfer policy was used by a large number of students to flee from the predominantly black schools, Main and Michigan, to Verlinden, a predominantly white school. A substantial percentage of those transferring were white students at a time when white students made up a relatively small portion of the Main and Michigan student bodies. Evidence in the record adequately supports the District Court's finding that the special transfer policy was being abused by students, black and white, who were trying to escape from schools which were becoming increasingly segregated. That black students as well as white students were taking advantage of the special transfer policy to transfer in unusually large numbers from schools becoming increasingly black to the predominantly white Verlinden School is no defense to a charge of de jure segregation. If anything the proclivity of blacks to join whites in fleeing from minority to majority schools stands as mute evidence of the rela-

tive inferiority of the segregated schools. The school board was certainly aware of abuse of the special transfer policy. In 1961 the Citizens' Committee on School Needs reported that the transfer policy should be changed because it contributed to segregation. In 1965, the Education Committee of the Lansing NAACP presented to the Board of Education a report which criticized the transfer practices and which noted that no action had been taken since the 1961 recommendation. In 1966, the report of the Citizens' Advisory Committee condemned the transfer policy and recommended that a psychologist or psychiatrist be utilized to evaluate the emotional needs of students seeking transfers. In January 1967, this recommendation was adopted by the Board and the special transfer policy was amended to require verification by a psychiatrist for any transfer based on emotional instability. However, in June 1967, the transfer policy was amended again to require either the statement of a psychiatrist or a physician, thus marking a return to the former policy which had been abused. The District Court found that "the transfer policy was abused in a way which contributed to the segregative conditions in these schools and with the knowledge of school officials and the Board of Education." The Court concluded that the "Board's intentional maintenance of the transfer policy and its refusal to change it, had the clearly foreseeable effect of increasing racial identifiability of Main Street School, Michigan Avenue School, and Verlinden Street School." We affirm the inference of segregative intent drawn by the District Court from continuation of the special transfer policy. A policy which allows transfers from racial minority schools to racial majority schools invites abuse, and where such abuse occurs and is ignored by school authorities it is tantamount to an authorization for white students to flee and is an obvious means for the perpetuation of segregation. See Monroe v. Board of Commissioners, 391 U.S. 450, 458–59, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968); Goss v. Board of Education, 373 U.S. 683, 688, 83 S.Ct. 1405, 10 L.Ed.2d 632 (1963); Davis v. Board of School Commissioners, 414 F.2d 609, 610 (5th Cir. 1969). Where the foreseeable and actual result of a transfer policy is to increase the racial identifiability of schools with large minority enrollment, continuation of the policy gives rise to a presumption of segregative intent. See Armstrong v. Brennan, 539 F.2d at 635; United States v. School District of Omaha, 521 F.2d at 540; Morgan v. Kerrigan, 509 F.2d at 589–90. That presumption was not rebutted in this record.

A similar presumption arises from the use of mobile classrooms at the Main Street School. In 1962, Main Street School was overcrowded and the Board of Education decided to add two mobile units. At the time, two predominantly white schools within walking distance of Main, Verlinden and Barnes, were undercapacity. The school board could have relieved the overcapacity at Main and, at the same time, enhanced integration in the school district by transferring students from predominantly black Main to the white schools. Instead, the Board ignored this alternative and chose to contain the black students in mobile classrooms at Main. In 1964, parental pressure forced the Board to transport students to Walnut School to relieve overcrowding at Main.[11] In 1971–72, the reverse situation arose when Verlinden, the predominantly white school, became overcrowded. Rather than adjust boundary lines to relieve the pressure at Verlinden by transferring students to adjacent minority schools, the Board set up mobile classrooms to retain the students in the Verlinden ser-

11. The District Court found that Verlinden is about 14 blocks or slightly over a mile north of Main Street School and that Barnes Avenue School is about 1.2 miles southeast of Verlinden. Verlinden was within approved walking distance of Main, although transportation would have been required to transfer students from Main to Barnes. In 1964 when community opposition to the use of mobile classrooms arose, buses were used to transport students out of their neighborhood to the Walnut Street School which was not adjacent to Main.

vice area. In these situations, the use of mobile classrooms at racially identifiable schools at a time when there was classroom space available in adjacent schools "had the clear effect of earmarking schools according to their racial composition . . . ." *Keyes v. School District No. 1*, 413 U.S. at 202, 93 S.Ct. at 2694. *See also Oliver v. Michigan State Board of Education*, 508 F.2d at 184. Given other practices suggesting purposeful separation of the races in Lansing elementary schools, the District Court was warranted in inferring segregative intent from the Board's use of mobile classrooms at Main and Verlinden. We also affirm the District Court's finding that "the existence of relatively inferior facilities at minority schools is another indicium of the Defendants' segregative purpose," *see Berry v. School District of Benton Harbor*, 505 F.2d 238, 242 (6th Cir. 1974), and that the Board of Education pursued a practice of disproportionate assignment of minority teachers and administrators to predominantly black schools, which, in turn, contributed to the racial identifiability of the schools. *See Oliver v. Michigan State Board of Education*, 508 F.2d at 185; *Berry v. School District of Benton Harbor*, 505 F.2d at 242.

■■■■■ By 1964 it had become apparent that Lansing had segregated schools. Lincoln School was 100% black, Main Street School was 95% black and Michigan Avenue School was 74% black. Of the total black enrollment in Lansing elementary schools, 77% of the students attended these four schools. The Board of Education's response to the increasing segregation in the elementary school system furnishes additional indicia of de jure segregation. In the fall of 1964, the Board initiated a policy of transporting students out of the River Island area to schools in outlying areas in order to relieve overcrowding at minority schools and to help end the racial isolation of certain schools. The integration effort was accomplished by phasing out and closing the predominantly black schools, Lincoln and Kalamazoo, and transporting the pupils to

outlying white schools. The District Court found that "the 'one-way busing' program adopted by the Lansing Board of Education caused the burden of desegregation to fall disproportionately on Blacks. It also had the effect of keeping the 'neighborhood school policy' a reality for Whites, while making it chimerical for Blacks." The Court found that the distances involved in one-way busing were greater than those involved in the cluster plan which the Board of Education eventually adopted. The District Court concluded that the Board of Education's decision to place the burden of integration solely on the black students was discriminatory. In *Higgins v. Board of Education*, 508 F.2d at 793, we stated that the burdens and inconveniences of integration should not be placed discriminatorily on a particular group. In *Higgins* we upheld a voluntary busing plan for a school district which was not found to have engaged in de jure segregation and which did not, in practice, involve a one-way busing program of minority students from the inner city to periphery schools, 508 F.2d at 794. The implication in *Higgins* is clear that a program that does involve one-way busing of minority students in a system which has a history of de jure segregation violates equal protection. *See also Brice v. Landis*, 314 F.Supp. 974, 978 (N.D.Cal.1969). We therefore affirm the District Court's finding that the one-way busing of black children, beginning in 1965 and continuing to the present, without a corresponding effort to spread the burden of integration more equitably through the system, is an act of de jure segregation.

■■■■■ In 1971 the Board of Education established a second Citizens' Advisory Committee on Equal Educational Opportunity to review the 1966 Citizens' Committee report and to make new recommendations where necessary. On the basis of 1971–72 school year statistics, the Committee reported that Lansing elementary schools were "still segregated, in terms of governmental requirements." In response to the Commit-

tee Report and a civil action brought in state court, the Board of Education resolved to adopt a voluntary desegregation plan. The Board adopted a "cluster plan" which involved transporting students by grade to various named schools. Only thirteen schools were involved in the three stage plan and the distances involved in transportation were relatively short, and less than those of the one-way busing of black children already in effect. Clusters one and two were inaugurated in 1972 and remained in effect for the 1972–73 school year. Cluster three began in 1973 and was in effect in 1973–74. Implementation of the cluster plan resulted in the voluntary integration of a substantial portion of Lansing's elementary schools. The Board of Education's efforts at voluntary integration ran into opposition. On November 7, 1972, a recall election was held and all five members of the Board who had voted in favor of the cluster-school plan were recalled. On January 11, 1973, a special election was held

and the newly-created vacancies on the Board of Education were filled by opponents of the integration plan. On February 1, 1973, at the first meeting of the re-constituted Board after the election of officers, the members voted to amend the June 29, 1972 Policy Statement on Equal Educational Opportunity by omitting statements admitting the existence of segregated schools in Lansing and extolling the value of racially integrated educational experiences.[12] The amended policy statement reaffirmed the "neighborhood school concept" and denied the commission of any acts of de jure segregation.[13] The Board also rescinded the cluster-school plan effective at the end of the 1972–73 school year. The amended resolution declared that attendance patterns which existed in 1971–72 in the kindergarten through sixth grade would be restored. The cluster desegregation plan had been in effect for several months before its rescission and had achieved a level of integration in the participating schools.[14]

---

12. The following language was omitted from the Policy Statement on Equal Educational Opportunity at the February 1, 1973, meeting of the Board of Education:

> "It is the position of this Board that there are three ingredients to a successful program for disadvantaged children: compensatory education, improvement of self-concept, and social and racial integration. It is also the position of this Board that this school system must devise some means of providing for each of these ingredients. . . .
>
> Equal educational opportunity is most possible to achieve in schools where there is reasonable balance in the racial composition of the student population. It shall be the goal of this school district to achieve such balance. This Board of Education believes that in any racially-mixed community segregated education and quality education are not compatible and that steps must be taken to insure that the school system advances further toward the goal of true equality of educational opportunity.
>
> The Board of Education shall not knowingly establish or sustain any condition which is detrimental to a child's sense of individual worth, and shall actively seek to find ways to change these conditions when such conditions inhibit learning."

13. The following resolution was adopted by the Board of Education at its February 1, 1973,

meeting rescinding the cluster-school desegregation plan:

> "Whereas, this Board of Education recognizes that there is a wide diversity of feelings in the community to the cluster plan as an educational experiment, and, whereas there is no conclusive research or evidence to support the contention that the cluster plan, as conceived and instituted does or will improve the educational achievement of the pupils affected, and, whereas the Board feels that the neighborhood family school is preferred for elementary students by the majority of the citizens of this school district, and, whereas the cooperation of parents is essential to the well being of any school system, and, whereas, the community's financial support is vital to the operation of the school district and, whereas there are no schools in this system where an ethnically-imbalanced student population has resulted from an act of de jure segregation; now, therefore, be it resolved that in accordance with the revised policy 6121, the cluster plan as adopted on June 29, 1972, be rescinded at the end of this school year (June 30, 1973). . . ."

14. The opinion below contained three charts showing the percentage of minority enrollment at the thirteen schools participating in the cluster plan. Chart I is of the schools involved in

At trial, members of the Board who voted for rescission admitted that they knew that the effect of rescinding the cluster plan would be to return black children to re-segregated schools from schools which had been integrated under the cluster plan. They also acknowledged that they had not undertaken a concentrated study of the results of the cluster plan before voting for rescission. The District Court found that:

The new Board's rescission of the cluster plan was an intentional act whose obvious, foreseeable effect would be to resegregate the schools involved, with

phases one and two of the plan initiated in the 1972–73 school year. Chart II is of schools involved in phase three of the plan initiated in the 1973–74 school year:

I

### CLUSTERS ONE AND TWO
#### % Minority

| Cluster One | 1967–68 | 1968–69 | 1969–70 | 1970–71 | 1971–72 | 1972–73 |
|---|---|---|---|---|---|---|
| Main | 97% | 97% | 89% | 90% | 88% | 65% |
| Barnes | 6% | 5% | 6% | 6% | 7% | 15% |
| Elmhurst | 4% | 8% | 9% | 9% | 7% | 19% |
| Lewton | 0% | 0% | 1% | 15% | 11% | 22% |
| *Cluster Two* | | | | | | |
| Maple Hill | 1% | 11% | 17% | 17% | 15% | 24% |
| Michigan | 87% | 84% | 90% | 92% | 90% | 55% |
| Cavanaugh | 1% | 1% | 3% | 4% | 4% | 21% |
| Everett | 2% | 2% | 2% | 3% | 5% | 15% |

II

### CLUSTER THREE

| | 1967–68 | 1968–69 | 1969–70 | 1970–71 | 1971–72 | 1972–73 | 1973–74 |
|---|---|---|---|---|---|---|---|
| Cedar | 41% | 41% | 46% | 45% | 56% | 67% | 50% |
| Grand River | 32% | 29% | 33% | 38% | 37% | 41% | 37% |
| Oak Park | 17% | 27% | 32% | 32% | 37% | 42% | 39% |
| Post Oak | 4% | 4% | 5% | 5% | 5% | 7% | 13% |
| High | 28% | 31% | 34% | 34% | 34% | 35% | 32% |

Chart III demonstrates what the effect would be of allowing rescission of the cluster plan in the 1975–76 school year:

III

### EFFECT OF ALLOWING RESCISSION
#### AT THE PRESENT TIME
#### CLUSTERS ONE, TWO AND THREE,
#### % MINORITY

| Cluster One | 1975–76 | Without Clusters |
|---|---|---|
| Main | 67% | 80% |
| Barnes | 22% | 14% |
| Elmhurst | 23% | 9% * |
| Lewton | 21% | 3% |
| *Cluster Two* | | |
| Maple Hill | 21% | 5% |
| Michigan | 65% | 83% |
| Cavanaugh | 29% | 9% |
| Everett | 22% | 10% |
| *Cluster Three* | | |
| Cedar | 50% | 57% |
| Grand River | 51% | 43% |
| Oak Park | 43% | 33% |
| Post Oak | 13% | 2% |
| High | 32% | 43% |

Black children being reassigned to the Black schools, and White children being reassigned to predominantly White schools.

If the rescission per se is not sufficient to constitute evidence of de jure segregation, it is highly probative of segregative intent.

We agree. Although school authorities in a school system which has not engaged in purposeful segregation are afforded substantial leeway in formulating plans to achieve racial balance, see *Higgins v. Board of Education,* 508 F.2d at 793, 794, where a school board has a constitutional duty to desegregate its schools, manifested by cumulative acts of de jure segregation, rescission of a voluntary desegregation plan is evidence of segregative intent. *Oliver v. Michigan State Board of Education,* 508 F.2d 185–86; *Brinkman v. Gilligan,* 503 F.2d at 684. *See also Bradley v. Milliken,* 433 F.2d 897, 902–04 (6th Cir. 1970). Here the record amply supports the District Court's finding that the decision to rescind the desegregation plan was made in the context of cumulative acts of de jure segregation which had contributed to the racial identifiability of schools in the River Island area and with full knowledge that rescission of the cluster plan would return black children to re-segregated schools. In view of the District Court's finding of cumulative constitutional violations, we need not reach the question of whether rescission of the desegregation program was, in itself, an act of de jure segregation. *See Brinkman v. Gilligan,* 503 F.2d at 697.[15]

▮▮▮▮ The rescission of the desegregation plan must also be viewed in the context of two companion decisions by the Board Education: the selection of a site for the construction of the new Vivian Riddle Elementary School, and the decision to continue one-way busing of black children until that construction was completed. The site selected for the new elementary school was in the most heavily black area in Lansing. The projected capacity for the Vivian Riddle School was well over 500, much greater than the 200 students enrolled at Michigan Avenue School which Vivian Riddle was designed to replace. When a new west side facility was originally proposed, it was assumed that the school would be operated under a district-wide desegregation plan. In the June 29, 1972, resolution adopting the cluster plan, the Board of Education noted that future desegregation plans would include "the opening of the new west-side elementary facility as a basis for cluster-school development." With the rescission of the cluster plan however, it became evident that Vivian Riddle would open as a segregated school. A majority of the members of the Board testified that they intended to operate Vivian Riddle strictly as a neighborhood school, if possible, knowing that the enrollment would then be 90% minority when it opened. The District Court found "that the Board's decision to place the new facility in an almost entirely Black neighborhood, coupled with its manifest intent to operate it strictly as a neighborhood school, thus guaranteeing a student body over 90% minority is significant evidence of de jure segregation. It is a deliberate act . . . .. Seen as part of a pattern of actions by this Board, it proves segregative intent beyond question." The District Court also found discrimination in the Board's decision to continue the one-way busing of black children, despite rescission of the cluster plan, until construction

---

**15.** Here, unlike in *Dayton,* the Lansing Board of Education by rescinding the cluster-school plan already in effect has acted "to undo operative regulations effecting the assignment of pupils [and] other aspects of the management of school affairs." *See Dayton Board of Education v. Brinkman,* —— U.S. at ——, 97 S.Ct. at 2772. In the *Dayton* case, the Supreme Court affirmed this Court's treatment of the question of rescission of a voluntary desegregation plan in *Brinkman v. Gilligan,* 503 F.2d at 697, which we adhere to in today's decision. In response to Justice Rhenquist's criticism in the *Dayton* case that the phrase "cumulative violation" is ambiguous, —— U.S. at ——, 97 S.Ct. 2766, we wish to explain that our use of the term simply means at the Board's decision to rescind the operative cluster-school plan was made after the commission of acts of de jure segregation which devolved on the Board an affirmative duty to remedy the effects of its previous segregative acts.

of Vivian Riddle was completed. Patterns of school construction and abandonment, along with student assignment policies, are factors entitled to great weight in determining de jure segregation. *Keyes v. School District No. 1,* 413 U.S. at 202–03, 93 S.Ct. 2686, *citing Swann v. Board of Education,* 402 U.S. at 20–21, 91 S.Ct. 1267. In *Keyes,* one factor which indicated system-wide de jure segregation in Denver was "the [school authorities'] practice of building a school . . . to a certain size and in a certain location, 'with conscious knowledge that it would be a segregated school' . . . ." 413 U.S. at 201–02, 93 S.Ct. at 2694. School construction which promotes racial imbalance or isolation is an important indicium of a de jure segregated school system. *Oliver v. Michigan Board of Education,* 508 F.2d at 184. *See also United States v. School District of Omaha,* 521 F.2d at 543; *United States v. Board of School Commissioners of Indianapolis,* 474 F.2d 81, 87 (7th Cir. 1973). We agree with the District Court that the decision to locate a new elementary school in the heart of the ghetto and to operate it strictly as a neighborhood school, ensuring its opening at 90% minority enrollment, demonstrates the Board's intent to continue the practice of containing black children in racially identifiable schools. We note, as did the District Court, that the capacity of Vivian Riddle is sufficient to include the enrollment at Michigan Avenue School as well as children living in service areas of the closed Lincoln and Kalamazoo schools, now attending integrated schools. The effect of the Board's decisions to rescind the cluster-school desegregation plan and to construct a large new elementary school in a heavily black area to be operated on a "neighborhood school" basis, would be to re-segregate an elementary school system which had been successfully integrated.[16] School authorities, bound by constitutional mandate to desegregate, cannot be permitted to dismantle a unitary school system and to reinstitute a dual school system. *See Keyes v. School District No. 1,* 413 U.S. at 200–01 & n. 11, 93 S.Ct. 2686; *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. at 15, 91 S.Ct. 1267; *Green v. County School Board,* 391 U.S. at 437–38, 88 S.Ct. 1689.

■ Our review of the record convinces us that the District Court did not commit clear error in finding that the Lansing Board of Education has practiced de jure segregation in the administration of the public elementary schools. Since the 1950's when the racial composition of Lansing's west side began to change, the Board has followed policies the natural, probable and foreseeable result of which was to contain minority students in racially identifiable schools. The requisite segregative intent or purpose for a finding of constitutional violation is readily inferable from the gerrymandering of attendance zone boundaries, the granting of special transfers from minority to majority schools, the use of mobile units under circumstances which enhance the racial identifiability of schools, the one-way busing of minority students, the discriminatory assignment of minority faculty and administrators, the relative inferiority of facilities at minority schools, the rescission of the cluster-school desegregation plan, and the choice of location of the new Vivian Riddle School coupled with the decision to operate it as a neighborhood school so that it is certain to open as a segregated facility. While purporting in theory to follow a racially neutral "neighborhood schools" policy, the Board in practice has adhered to a policy of "neighborhood schools" where it justifies racial segregation of students and deviated from the policy when necessary to prevent meaningful integration of the elementary schools. Examples of the latter practice are the gerrymandering of attendance zones to match the racial composition of service areas with the predominant racial profile of particular schools, the special transfer policy which allowed white students to escape from their neighborhood schools to white schools out-

16. If the new Vivian Riddle School were to be operated at full capacity as a neighborhood school, the service area it would serve would be so large that transportation of students from the periphery would be required under Board guidelines.

side their neighborhoods, and the policy of one-way busing of minority students. We also have considered the Board's contention that it was denied a fair trial and find it to be totally without merit. The judgment of the District Court is affirmed.[17]

---

17. By enjoining implementation of the resolution rescinding the cluster school desegregation plan, the District Court maintained the status quo ante pending resolution of the final remedy. Since the injunction is amply warranted by the findings of constitutional violations made by the District Court and affirmed by this Court, it complies with the guidelines set down by the Supreme Court in *Dayton Board of Education v. Brinkman*, —— U.S. at ——, ——, 97 S.Ct. 2766.