LaKenya **MIDDLEBROOK**, an infant by her next friend Harold **MIDDLE-BROOK**, et al., Plaintiffs,

v.

**SCHOOL DISTRICT OF the COUNTY OF KNOX, TENNESSEE, et al.,** Defendants.

No. CIV 3–91–0461.

United States District Court, E.D. Tennessee, At Knoxville.

Aug. 24, 1991.

William Gordon Ball, and Herbert Moncier, Knoxville, Tenn., for plaintiffs.

Richard T. Beeler, Knox County Law Director, and John E. Owings, Deputy Law Director, Knoxville, Tenn., and Alfred A. Lindseth, Alexa R. Ross, Southerland, Asbill & Breenan, Atlanta, Ga., for defendants.

## MEMORANDUM OPINION

JORDAN, District Judge.

This civil action is before the Court for consideration of the plaintiffs' motion for a preliminary injunction under Fed.R.Civ.P. 65 [doc. 3]. The plaintiffs, representatives of black students enrolled in the Knox County, Tennessee school system, and of disabled[1] students enrolled in the same school system, seek to enjoin the defendants, the School District of the County of Knox, the members of its school board, and the superintendent of this school system[2], from going forward with the implementation of a plan for the desegregation of this school system. For the reasons stated in this Memorandum Opinion, the Court has concluded that it must deny this motion for a preliminary injunction.

## I. PROCEDURAL HISTORY

The plaintiffs filed their complaint and their motion for a preliminary injunction on August 9, 1991. On the same day, they filed a motion [doc. 2] asking the Court to order an expedited discovery schedule. This litigation has proceeded in a state of emergency from its inception, because the

---

1. The Court will in this Memorandum Opinion use the adjective "black" to refer to students of African descent, in the manner in which the adjective is used frequently in litigation and adjudication under the Equal Protection Clause of the 14th Amendment to the United States Constitution. The Court will use the adjective "disabled" to describe the condition of "children with disabilities," as that phrase is defined in 20 U.S.C.A. § 1401(a)(1) (West 1991 Supp.), part of the Individuals with Disabilities Education Act, formerly the Education of the Handicapped Act, as amended and codified. The Court is conscious of the fact that there is some disagreement concerning the appropriateness of these terms, and therefore hastens to state its intent not to insult any group or individual by its use of these words.

2. For convenience, except where clarity might require more specificity, the Court will in this Memorandum Opinion refer to the defendants collectively as "the school board."

desegregation plan under attack will begin to be enforced in the 1991–1992 school year, scheduled to begin on Monday, August 26, 1991.

On August 9, the Court set the plaintiffs' motion for a preliminary injunction for a hearing on August 15 [doc. 4]. On August 12, with the agreement of counsel for both sides[3], the Court continued this hearing to August 21, and granted the plaintiffs' motion for expedited discovery [doc. 5].

At the request of the Court, the defendants filed their memorandum of law [doc. 20], on August 19. The plaintiffs filed theirs on August 20 [doc. 24]. The parties exchanged and filed witness lists, and this action proceeded to the hearing on the plaintiffs' motion as scheduled on August 21.

The Court received evidence for three days, concluding the hearing after 5 p.m. on Friday, August 23. The Court heard testimony by many witnesses, including parents of children affected by the desegregation plan under attack, an expert for the plaintiffs, two experts for the defendants, a black member of the school board who voted in favor of the plan, and the defendant superintendent. The Court received numerous exhibits, including many pages of transcripts of depositions. Faced with this amount of evidence, and the imminent implementation of the plan on Monday, the Court took the plaintiffs' motion for a preliminary injunction under advisement, to consider the evidence, and to render an opinion over the weekend before the beginning of the 1991–1992 school year.

## II. THE PLAINTIFFS' ALLEGATIONS

A summary of the plaintiffs' contentions is required for an understanding of this litigation. This summary will be made more comprehensible by the inclusion of facts concerning the background of this controversy, which the Court has gleaned from the evidence.

Until 1987, what is now the Knox County school system was two systems, one for the county, and one for the City of Knoxville. The county exclusive of the city has a very small black population. The former county school system was never a defendant in any desegregation litigation, and therefore there has never been a judicial declaration that the county school system, either as it existed before the merger of these two systems, or as it exists now, is either a dual or a unitary system.

The former City of Knoxville school system, on the other hand, was the subject of extended litigation concerning the rights of black students. *See Goss v. Board of Education of City of Knoxville, Tennessee*, 482 F.2d 1044 (6th Cir.1973), *cert. denied*, 414 U.S. 1171, 94 S.Ct. 933, 39 L.Ed.2d 120 (1974). In *Goss*, this Court, speaking through the late Judge Taylor, found the city school system to be a unitary one, a finding which was upheld on appeal.

Since the time of *Goss*, until the implementation of the desegregation plan under attack in the litigation now before the Court, one desegregation tool used in the city school system and in the county school system created by the merger of the two systems has been what is called the M to M transfer policy. "M to M" stands for "majority to minority." In its simplest form, an M to M policy allows a student to transfer out of any school where his or her race comprises 50% + 1 of the student body to any other school in the same system where his or her race is in the minority (50% − 1).

The majority of Knox County's black population is concentrated in two neighborhoods in the eastern portion of the City of Knoxville. This fact, combined with the locations of school zones as they existed before they were redrawn as part of the desegregation plan under attack, has led to the existence of schools in east Knoxville

---

[3]. The Court takes this opportunity to state that all counsel for both sides have shown throughout the course of this litigation to this point a degree of cooperation, competence, and professionalism which should make their clients proud, and which should help to remind the public of the necessity and importance of good attorneys to the delivery of justice in this nation's courts.

which are predominantly black.[4] Even though the black students comprise only 12% of the county-wide student population, some of the schools in east Knoxville are 90% or more black.

Some time before the commencement of this litigation, some black citizens of Knox County filed a complaint against the Knox County school system with the Office of Civil Rights ("OCR") of the United States Department of Education. This complaint focused not upon the racial composition of schools in east Knoxville or elsewhere in the system, but, instead, upon such matters as the use of race as a factor in assigning members of the faculty and staff to certain schools, and the handling of disciplinary problems with black students who had made use of the M to M transfer policy by transferring them back to schools in their home zones before the end of a quarter or semester. These issues were addressed by the school board under the governance of OCR, and are not before this Court.

Correctly or not, at least some of the members of the school board perceived that the next time a complaint concerning the Knox County school system were filed with OCR, that agency would undertake a full-scale review of the system's compliance with applicable antidiscrimination law, including compliance with regulations promulgated under Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §§ 2000d, *et seq.* (West 1981 and 1991 supp.). Fearful that the findings made upon such a review might not be entirely favorable, the school board determined that it should undertake a voluntary, comprehensive desegregation plan. This led to the adoption of the plan under attack, which, for convenience, the Court will refer to simply as "the plan" in the rest of this Memorandum Opinion.

The plan attempts to increase the racial balance in the Knox County school system by a combination of redrawing some zone boundaries, closing some existing schools, transporting some students out of their home zones, creating magnet programs in some schools to attract students away from their home zones voluntarily, and building some new educational facilities. It is scheduled to be implemented in stages from the present to 1994. To the extent that the plan depends upon new construction, it remains necessarily provisional, because the school board's budgets are composed from year to year through a political process, and the school board cannot compel funding of its proposals. *Cf. State ex rel. Weaver v. Ayers,* 756 S.W.2d 217, 221–22 (Tenn.1988) ("While the local board of education has exclusive control over many operational aspects of education policy, subject to the rules and regulations of the State Department of Education, the county legislative body has the authority to appropriate the funds necessary to carry out the county education program.").

The plan places a limitation upon M to M transfers by prohibiting any transfer which would have a "negative racial impact," which is defined in the plan to

> mean[ ] an increase of minority racial composition greater than [2%] in any one year or [5%] cumulative in any four year period in schools having a minority racial composition greater than the system average. [It] also means any increase in minority racial composition in schools where the base line data in [the plan] indicates a minority racial composition of greater than one and one-half (1.5) times the system average.

The effect of the second sentence of this definition is better understood by using the

---

**4.** Expert witnesses and attorneys involved in this case have stressed the importance of the use of defined phrases in referring to the demographic facts which are so important in litigation of this nature. For the Court's purposes, a school is predominantly black if its student population is 50% + 1 black, and a school is predominantly white if its student population is 50% + 1 *other than black.* The Court recognizes that there are more than two races of human beings, and hastens to state that it does not intend by its use of this terminology to insult any person or group. However, neither side adduced any evidence to show the involvement of other races in the Knox County school system, and the plaintiffs' entire case, apart from their case concerning disabled students, focused upon alleged discrimination against black students as a discrete minority.

actual percentages of the racial composition of this school system. Assuming a system-wide composition of 12% black, a black student is prohibited from transferring to a school if his or her transfer would render that school more than 18% black.

M to M transfers are still permitted subject to this limitation. The plan provides,

The school system will provide transportation in cases in which the transferring minority student's base school's percent of minority composition is greater than [1.5] times the system's average percent and the receiving school's percent of minority composition is less than one-half (0.5) times the system's average percent. Majority students zoned to base schools in which the percent of minority racial composition is less than [0.5] times the system average percent may be granted transfers, with system-provided transportation, to schools in which the percent of minority racial composition is greater than the system average percent.

Another provision addresses the circumstance in which a student desires to participate in a class not offered at his or her base school: "In cases where such a transfer would produce a negative racial impact, students may transfer for the course only and return to the base school with system provided transportation."

The magnet programs created under the plan are programs within schools ("PWS"), as opposed to "dedicated magnets." A magnet program involves the provision of a better-than-average education within a certain discipline—computer science, for example—by using a concentration of faculty and equipment within that discipline greater than that found in other schools within the system. A dedicated magnet takes over the entire school facility which houses it, whereas students in a magnet PWS attend school in a facility with students not enrolled in the magnet program. The degree of interaction between magnet and nonmagnet students varies. This plan projects that its magnet programs will have a racial composition which is 75% white, so that seats will be available for black students in amounts in excess of those which would be provided by strict adherence to the percentages of system-wide racial composition.

The plaintiffs' complaints about the desegregative aspects of the plan may be summarized as follows. The plan unfairly burdens the black students in the school system by closing a disproportionate number of existing schools in predominantly black communities, by placing a planned university high school on a site within the redrawn inner city zone which is in fact distant from any predominantly black community, and by busing a disproportionate number of black students out of their home zones to schools which are predominantly white. The plan also violates applicable antidiscrimination law by restricting the availability of M to M transfers according to a racial quota system.

The plaintiffs' complaint on behalf of disabled students is that the busing mandated by the plan will relocate some disabled students without there having been any review of proposed changes in those students' educational placements in accordance with the procedures required under applicable federal law.

## III. THE STANDARD FOR INJUNCTIVE RELIEF

It cannot be overemphasized that this is not a case in which a judicial finding of the existence of a dual school system has led to a mandate to create a court-supervised desegregation plan. This is instead a case in which this Court is called upon to find in a voluntary desegregation plan produced by the give and take of political consideration, argument and compromise a violation of constitutional and statutory rights of primary importance, and therefore to prohibit the school board from going forward with its voluntary plan. The considerations which this Court cannot avoid under Fed. R.Civ.P. 65 in granting or denying a preliminary injunction in this case are by now familiar:

The district court's exercise of discretion in issuing a preliminary injunction is guided by four familiar factors:

(1) whether the plaintiff will have an adequate remedy at law or will be irreparably harmed if the injunction does not issue;

(2) whether the threatened injury to the plaintiff outweighs the threatened harm the injunction may inflict on the defendant;

(3) whether the plaintiff has at least a reasonable likelihood of success on the merits; and

(4) whether the granting of a preliminary injunction will disserve the public interest.

*O'Connor v. Board of Education of School District No. 23,* 645 F.2d 578, 580 (7th Cir.), *cert. denied,* 454 U.S. 1084, 102 S.Ct. 641, 70 L.Ed.2d 619 (1981) (citation omitted). The third consideration "serves as a threshold requirement." *Id.*

Because the Court finds that the plaintiffs have not shown a reasonable likelihood of success on the merits in this case, the Court will deny their motion for a preliminary injunction. Given the time constraints imposed upon the Court by the nearness of the beginning of the Knox County school system's 1991–1992 school year, the Court must state its findings and conclusions here in a summary form.

## IV. FINDINGS AND CONCLUSIONS

■ Whether or not this school system became a dual system because of the merger of the City of Knoxville and the former Knox County systems, the black plaintiffs in this civil action must make a showing in this case of intentional, *de jure* discrimination on the part of the school board. *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). *See generally N.A.A.C.P. v. Lansing Board of Education,* 559 F.2d 1042 (6th Cir.), *cert. denied,* 434 U.S. 997, 98 S.Ct. 635, 54 L.Ed.2d 491 (1977).

The defendants' lay witnesses' explanations of the school board's motivation in adopting the plan are entirely credible. It is not for the Court to say whether different officers or employees of OCR made differing statements concerning the kind and extent of desegregation for which that agency might look in a full-scale review of this school system, or whether the school board misapprehended the requirements imposed upon it by law and particularly by the body of law enforced by OCR, or whether the school board overreacted to the real or imagined threat of a finding by a government agency that it was operating a dual system. The only inquiry which the Court may make in this regard is whether the motivation in adopting the plan was invidious discrimination on the basis of race, and the Court finds that it was not.

It must be kept in mind in considering all aspects of this case that, once the school board set out to promote the desegregation of schools by a systematic plan, it, being a quasi-legislative body, had a much broader range of choices among means of desegregation than would be available to a court ordering desegregation on the basis of a finding of a dual system.

School authorities are traditionally charged with broad power to formulate and implement educational policy and might well conclude, for example, that in order to prepare students to live in a pluralistic society each school should have a prescribed ratio of Negro to white students reflecting the proportion for the district as a whole.

*Swann v. Charlotte–Mecklenburg Board of Education,* 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 1971). *See also McDaniel v. Barresi,* 402 U.S. 39, 91 S.Ct. 1287, 28 L.Ed.2d 582 (1971), decided on the same day as *Swann.*

This provides a sufficient answer to the contention that the aspect of the plan which limits M to M transfers by application of the negative racial impact rule deprives the black plaintiffs of equal protection. As for the contention that other aspects of the plan place a disproportionate share of the burden of desegregation upon the black students, particularly with respect to busing and school closings, the Court finds that this is not the case. Using absolute numbers instead of percentages, many more white children than black children will be bused under the plan. While it is true that a very high percentage of the black children who live in the two inner city neighborhoods or communities identified by

one of the plaintiffs' witnesses, Mr. Little-john, will be bused under the plan, this is a result to a great degree of the very fact that those communities contain most of the county's black population, a fact of residential patterns which was not produced by preexisting discrimination *in education,* and a fact with which the school board was forced to deal in order to work toward its stated goal of "[e]liminat[ing] as many racially identifiable schools as reasonably possible (using OCR definition)." [5]

As for school closings, the defendants established to the Court's satisfaction that the closings of several inner city schools are justified by the size and condition of these schools. The facilities formerly operated by the City of Knoxville school system are, in the main, not up to the quality of the schools which were already in the county school system at the time of the merger of the two systems in 1987, and they are too small to provide to the students in the zones in which they are located the complete curricula which modern educational needs demand. The defendants' presentation of evidence, which the Court finds credible, of objective reasons for closing certain schools, and of the reasons for rejecting alternatives to these school closings, establishes that the closings were not motivated by unlawful discrimination on the basis of race. *See Davis v. Board of Education of North Little Rock, Arkansas, School District,* 674 F.2d 684, 688 (8th Cir.), *cert. denied,* 459 U.S. 881, 103 S.Ct. 178, 74 L.Ed.2d 146 (1982) (citation omitted).

Several of the plaintiffs' witnesses indicated that in fact the main goal of the black plaintiffs in this civil action is to prevent the closing of schools which have served their communities or neighborhoods for a long time. The community pride aroused by the traditions of these schools is completely understandable, as is the nostalgia of those who attended them as children, and now want to see their children attend them, too. However, a complete dedication to the heritage of the past would, taken to its logical conclusion, lead to the reestablishment of the very separate but equal regime which *Brown v. Board of Education of Topeka,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), commanded be destroyed. That is a result which this Court can neither mandate nor permit.

The Court is cognizant of the fact that the plan depends for the accomplishment of its goals in part upon the construction of new schools which will serve the communities where existing schools will be closed, and that the fact that such construction will depend upon the political process for its funding creates the possibility, which is only speculative at this time, that some difference between the plan on paper and the plan as effectuated will result in discriminatorily inadequate education for the students in the predominantly black school zones in the City of Knoxville. Because this possibility is only speculative at this time, it does not provide a ground for granting the injunction requested. It does, however, provide this Court with a reason to remind the school board that the Court's doors will remain open to the plaintiffs, and that the denial of an injunction today does not mean that any unlawful discrimination in the future will go unnoticed.

■ The Court is aware of the fact that the imposition upon black students of the greater burden of a desegregation plan can be taken as evidence of a discriminatory intent, *see N.A.A.C.P v. Lansing Board of Education, supra,* but finds that this is not true in this case. The Court was particularly impressed on this point by the testimony of one of the experts presented by the defendants, Dr. Christine H. Rossell, who showed in credible calculations that the plan will have an immediately desegregative effect measured in terms of exposing minority students to their peers in the majority in this school system.

5. The OCR definition of racial identifiability referred to in the plan is a guideline under which, for example, a school is identifiably black if the percentage of its student population which is black is 20 percentage points or more above the system-wide average percentage. Therefore, a Knox County school with a 33% black population is identifiably black. While this definition or guideline leads in this case to the seemingly nonsensical conclusion that an all-white school is not identifiably white, this is a function of the fact that the student population of the Knox County school system is more than 80% white.

Without extending the length of this Memorandum Opinion much more, the Court must address the contention made by the disabled plaintiff. Here again, the Court does not find that these plaintiffs have made that showing of likelihood of success on the merits which is necessary to a successful motion for a preliminary injunction. A change in the school building in which a disabled student receives his or her education is not necessarily a change in educational placement for the purposes of the federal Individuals with Disabilities Education Act, 20 U.S.C.A. §§ 1400, *et seq.* (West 1990 and 1991 supp.). *Weil v. Board of Elementary & Secondary Education,* 931 F.2d 1069 (5th Cir.1991). It appears that each parent of a disabled child in this school system continues to have available to him or her, regardless of the plan, all of the due process rights afforded by the act with respect to requiring personalized review of his or her child's educational situation by a multidisciplinary team of professionals ("M-team"). *See* 20 U.S.C.A. § 1415(b) through (e).

For the reasons stated, the Court must deny this motion for a preliminary injunction. The Court will address with the parties at a later time remaining matters in this litigation.