*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0135p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

FRANCES SPURLOCK; JEFFREY SPURLOCK, on behalf of their minor daughter, themselves, and all others similarly situated; KEITH CALDWELL; CARROLL LEWIS; TENNESSEE ALLIANCE FOR PROGRESS,

               *Plaintiffs-Appellants*,

     *v.*

DAVID A. FOX et al.,

               *Defendants-Appellees*.

No. 12-5978

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:09-cv-00756—Kevin H. Sharp, District Judge.

Argued: April 24, 2013

Decided and Filed: May 10, 2013

Before: GILMAN, ROGERS, and SUTTON, Circuit Judges.

─────────────────

**COUNSEL**

**ARGUED:** Michael Lottman, Kingston Springs, Tennessee, for Appellants. Allison L. Bussell, DEPARTMENT OF LAW OF THE METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, Nashville, Tennessee, for Appellees. **ON BRIEF:** Michael Lottman, Kingston Springs, Tennessee, Larry Woods, Allen Woods, WOODS & WOODS, Nashville, Tennessee, for Appellants. Allison L. Bussell, Christopher M. Lackey, DEPARTMENT OF LAW OF THE METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, Nashville, Tennessee, John W. Borkowski, HOGAN LOVELLS US LLP, South Bend, Indiana, for Appellees.

————————————

**OPINION**

————————————

RONALD LEE GILMAN, Circuit Judge.  This is a class-action lawsuit alleging racial resegregation in the Nashville public school system.   In July 2008, the Metropolitan Nashville Board of Public Education (the Board) adopted a new student-assignment plan generally referred to as the Rezoning Plan.   The Rezoning Plan modified the student-assignment plan that had been in place since the Metropolitan Nashville Public Schools District (the District) achieved unitary status (i.e., became desegregated) in 1998.  One of the modifications effected by the Rezoning Plan was to eliminate the so-called mandatory noncontiguous transfer zones, meaning that the existing system whereby students in racially isolated geographical zones were bused to racially diverse schools in noncontiguous zones was replaced by a system in which the same students were given a choice of either attending the schools in their own neighborhood or being bused to schools in the same noncontiguous zone as before, but not necessarily to the same school previously attended.

The parents and the grandmother, respectively, of two black children sued the Board on behalf of their children and all black students in the District whose school assignments were adversely affected by the elimination of the mandatory noncontiguous transfer zones.  They allege that the Rezoning Plan eliminated the desirable practice of being bused to a good, racially diverse school and replaced it with two inferior choices: staying in a bad, racially isolated neighborhood school or being bused to a bad, racially diverse school.  This, they claim, has led to resegregation in violation of the students' rights under the Equal Protection Clause of the United States Constitution.  The district court ruled in favor of the Board after an 11-day bench trial.  For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A. Factual background

The following facts are taken primarily from the district court's Findings of Fact and Conclusions of Law as filed in *Spurlock v. Metropolitan Government of Nashville*, No. 3:09–cv–00756, 2012 WL 3064251 (M.D. Tenn. July 27, 2012). Nashville has a long history of officially enforced school segregation. Following the Supreme Court's landmark decisions in *Brown v. Board of Education*, 347 U.S. 483 (1954) (*Brown I*) (holding that segregating schoolchildren by race is unconstitutional), and *Brown v. Board of Education*, 349 U.S. 294, 301 (1955) (*Brown II*) (imposing on local school boards in segregated districts the affirmative duty to "effectuate a transition to a racially nondiscriminatory school system"), Nashville, like many other previously segregated school districts, was ordered to desegregate. This was finally accomplished in 1998 when, pursuant to a settlement in *Kelley v. Metropolitan Board of Education*, No. 3:55-2094, the District achieved unitary status.

Unitary status means that a school district has abandoned the "dual" status of "intentional segregation of students by race" and "has been brought into compliance with the command of the Constitution." *Freeman v. Pitts*, 503 U.S. 467, 487 (1992) (internal quotation marks omitted). It signifies, in other words, that a district has "eliminated the vestiges of prior segregation to the greatest extent practicable" with respect to *legally* imposed segregation, although it does not mean that, as a *factual* matter, all district schools contain a racially diverse mix of students. *See Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 701, 715-16, 720-21 (2007). In fact, many school districts that are no longer segregated *de jure* remain segregated *de facto* due to private preferences reflected in housing patterns, and Nashville's District is no exception. *See Spurlock*, 2012 WL 3064251, at *16-17 (setting forth data showing that, both before and after the implementation of the Rezoning Plan, a number of neighborhoods and schools in Nashville were over 80-percent black and a few over 90-percent black). Once a school district has achieved unitary status, however, it is no

longer under an affirmative "duty to remedy imbalance that is caused by demographic factors." *Freeman*, 503 U.S. at 494.

After achieving unitary status, the District operated under a plan whereby students were assigned to schools largely on the basis of geography. Nashville's school system was organized into 11 (later changed to 12) "clusters," one cluster for each comprehensive high school. The cluster system provided for stable "feeder" patterns, meaning that students in the relatively large number of elementary schools in each cluster would be "fed" into a smaller number of middle schools in the same cluster, and middle-school students in turn would be funneled into the single comprehensive high school in the cluster.

Most clusters were geographically contiguous. Some, however, included noncontiguous zones—that is, areas that were considered part of the cluster even though they were not adjacent to the rest of it. Students from a cluster's noncontiguous zones, like students from elsewhere in the cluster, were assigned to the comprehensive high school in the cluster, and the District provided them with free school-bus transportation for that purpose. The noncontiguous zones included the poor and predominantly black Pearl-Cohn Cluster, which was linked to the comparatively well-off and racially diverse Hillwood Cluster. Nashville operated under this student-assignment plan from 1998 to 2008.

The old student-assignment plan was not without its disadvantages. One problem that had long worried Nashville's political leaders, including several mayors and the Metro City Council, was the under-utilization of various schools throughout the District. Some schools attracted a large number of students and were utilized above capacity, while other schools were relatively empty and operated at levels well below what their infrastructure and resources would allow. This problem grew worse after the failure of a September 2005 referendum to increase school funding.

The District has a history of attempting to address its under-utilization problem. In 2006, the District contracted with the Council of Great City Schools, an association of the nation's 66 largest urban school districts, to study zoning patterns and make

recommendations to the Board.  A team from the Council was sent to Nashville for this purpose but, as the trial transcript indicates, the team "fell apart" before making any recommendations.  Similarly, a task force appointed by the Board to look into potential rezoning and the closing of some schools in order to address the under-utilization problem "walked away" from the task after a few meetings because the issue was too politically contentious.

The school-utilization issue came up again in 2007, when the anticipated opening of the Cane Ridge High School in 2008 provided an impetus for the Board to tackle the challenge.  In May 2007, Larry Collier, then the District's Director of Student Assignment Services, made a presentation to the Board about the desirability of optimizing facility utilization, maximizing student choice, reducing transportation costs, and enhancing the involvement of families in their children's education.  The presentation also posed the question of whether the noncontiguous zones were necessary.

Collier drafted a rezoning plan over the summer and presented it to the Board in the fall of 2007.  Under the proposed plan, elementary- and middle-school students living in the Pearl-Cohn Cluster would no longer be bused to the distant Hillwood Cluster schools, but would instead be zoned to attend the schools closer to their own homes.  High-school students from the Pearl-Cohn Cluster, however, would continue to attend Hillwood High School for the time being.  Collier's plan was considered by the Board but ultimately withdrawn.  Instead, the Metropolitan Nashville Public Schools (MNPS) implemented a scaled-back plan that left the old student-assignment system largely intact but added a cluster to accommodate the new Cane Ridge High School.

In January 2008, the Board created a Community Task Force for Student Assignment (the Task Force) with a mission to come up with a new, comprehensive student-assignment plan for the District.  The Task Force initially consisted of twelve appointed members.  Of these, one was appointed by each of the nine Board members (including the Chair), one by the Mayor of Nashville, one by the MNPS Director, and one current Board member was placed on the Task Force as a second appointee of Board Chair Marsha Warden.  Mark North, the Board member appointed by Warden, chaired

the Task Force.  The members appointed by the MNPS Director and the Mayor later withdrew for reasons not specified by the district court or in the parties' briefs.  This left the Task Force with ten members, consisting of five blacks and five whites (including North).   (The words "black" and "white" as used throughout this opinion are synonymous with "African-American" and "Caucasian," respectively.)

The Board vested the Task Force with the goal "to develop a plan that promotes excellent academic and scholastic opportunities for every school-age resident of Davidson County" (the county that is coextensive with the city of Nashville).  It also gave the Task Force a list of nonexclusive factors to consider—namely, "building under-utilization and overcrowding," "choice options for students and parents," "diversity" (defined as "the benefit of different perspectives and backgrounds to the student, the classroom, the school, and the school system as a whole"), "enhanced academic achievement," "enhanced opportunities for extracurricular activities," "fiscal responsibility," "more parental involvement," "benefits of neighborhood schools," "stability and certainty for students and parents evaluating their options," and "potential unintended consequences."   Several materials were provided for the Task Force to consider in developing a new student-assignment plan, including a history of student-assignment issues in Nashville, the 1998 student-assignment plan, the Collier plan that was proposed and withdrawn in 2007, the scaled-back plan that had been adopted in 2007, demographic data, an article by two professors at Vanderbilt University analyzing the policy of neighborhood schooling in Nashville, and the Supreme Court's opinions in *Keyes v. School District No. 1*, 413 U.S. 189 (1973), and *Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701 (2007).

The Task Force began its work promptly in early January 2008.  It held weekly meetings lasting two to four hours each, all open to the public, and it also held separate brainstorming sessions.  The Task Force initially focused on the Pearl-Cohn and Hillwood Clusters because "they embodied virtually all the issues in the Task Force's charge, *e.g.*, building utilization, transportation costs, diversity, and school performance." *Spurlock*, 2012 WL 3064251, at *8. Task Force members considered and

debated all of the materials provided to them. They also personally took bus rides with schoolchildren going from noncontiguous zones to their assigned schools.

During its deliberations, the Task Force requested and received demographic data from the District staff, including student-enrollment numbers by race and socioeconomic status. The data also showed what the demographic and socioeconomic picture would look like if various proposals were adopted. Task Force members, including Chairman North, testified that they requested such data because racial and socioeconomic diversity was one of the factors that they had been asked to consider.

Task Force members, both black and white, testified favorably regarding the Task Force's own diversity—both racial diversity and the diversity of backgrounds and views. They testified that they individually did not harbor any racial prejudices and did not think that any other member harbored such prejudices either, and the plaintiffs do not point to any testimony or evidence to the contrary.

The Task Force ultimately achieved unanimous agreement on a set of recommendations that it initially presented to the Board at the end of May 2008. These recommendations—which, with certain revisions, would be adopted by the Board in July of that year as the final Rezoning Plan—left intact the basic structure of the old student-assignment plan whereby a student's geographical area of residence determined his or her school assignment. The Rezoning Plan did, however, alter the zoning designation of certain geographic areas and schools, propose school-specific recommendations, and close a number of schools.

Most importantly for the purposes of the present case, the Rezoning Plan changed the old noncontiguous zones to "choice zones." Under the new system, students in the former noncontiguous zones would not be required to attend a school in a geographically distant neighborhood. They would instead have a choice of either attending a school in their own neighborhood or being bused to a more distant school in the same cluster where they had formerly attended school, with free transportation provided by the District. But the new schools designated for students in noncontiguous zones were not necessarily the same individual schools designated under the old plan.

According to the Task Force, the new outside schools designated for noncontiguous-zone students were those that had the capacity to take in more students and stood to gain more from a diverse student body. The plaintiffs, however, have a different view of the matter. They claim that the newly designated schools were inferior to the schools to which they had been bused under the old plan. This inferior option, they allege, effectively directed the overwhelmingly black student population in noncontiguous zones away from the racially diverse schools in higher-income neighborhoods and toward the racially isolated schools in their own poverty-stricken neighborhoods.

The other significant modification effected by the Rezoning Plan was to increase the funding and resources allocated to schools in the poorer areas. Specifically, the Rezoning Plan called for more advanced-placement and honors course offerings, lower student-teacher and student-counselor ratios, enhanced pay for teachers, increased technology offerings, additional social workers, and full-time career and college counselors for schools in low-income and racially isolated neighborhoods.

These measures were designed to increase the utilization of low-income neighborhood schools—which, in the case of schools located in the Pearl-Cohn Cluster, were described in the Plan as "grossly underutilized"—by enhancing their quality and attractiveness. The same goal was also pursued through geographic rezoning. For example, the Rezoning Plan placed the relatively high-income Hope Gardens neighborhood, as well as affluent areas in Germantown and Downtown Nashville, into the Pearl-Cohn Cluster.

When North presented the Task Force's draft Rezoning Plan to the Board in May 2008, Board members asked questions and requested more details regarding certain aspects of the Plan, but were overall favorably disposed. Subsequently the Board sought and received community input on the proposed Plan. It held community meetings at East Literature Magnet School in East Nashville, Fall-Hamilton Elementary School in South Nashville, Hillwood High School in West Nashville, and John Early Middle School in North Nashville. The Board also scheduled meetings throughout June to

present the draft Rezoning Plan to and receive feedback from various interested groups and persons—including the Interdenominational Ministers' Fellowship, the National Association for the Advancement of Colored People (NAACP), the Parents Advisory Council, the Comité de Padres Latinos (the Committee of Latino Parents), the Metropolitan Nashville Education Association Teachers' Union, the Service Employees International Union, the Mayor's Office, and the authors of the Vanderbilt study.

Meanwhile, the Task Force met again to address some of the concerns expressed by the Board and the community. It provided more details on the additional resources recommended for the Pearl-Cohn Cluster, prepared a budget indicating where the additional resources would come from, and, in response to a request by a representative of the NAACP, added more advanced-placement and honors courses for the poorer schools. The Task Force also worked out the details of the zoned-option choice. Having made these modifications, the Task Force voted unanimously in favor of recommending the revised Rezoning Plan to the Board.

The Task Force presented the revised Rezoning Plan to the Board in early July 2008. North reiterated that "the most important thing is that every school be a good one." Others, however, spoke in favor of deferring the Rezoning Plan's implementation. Marilyn Robinson, President of the NAACP branch in Nashville, recommended that the Rezoning Plan be delayed because the Board could not guarantee additional resources for the poorer schools and because the Plan would create separate-but-equal schools by "warehousing students" in the Pearl-Cohn Cluster. Board member Ed Kindall similarly contended that the Rezoning Plan would increase racial and socioeconomic isolation without making meaningful progress on facility utilization and academic performance. Chairperson Warden then spoke out in defense of the Rezoning Plan, describing the history of gridlock on rezoning reform in Nashville and underscoring the Board's responsibility to vote on the Task Force's reform measures. In the end, the Board voted by a five-to-four margin not to delay a vote on the Rezoning Plan. The five-member majority consisted of one black and four whites; the four minority members were all black.

Debate then focused on whether to vote for or against the Rezoning Plan itself. Two Board members spoke in favor of the Plan, emphasizing the Task Force's diversity, apolitical nature, and unanimity. They also cautioned against adopting modified or alternative proposals that had been submitted on the spot by other Board members and had not been subject to prior deliberation. Another Board member recommended that the Board adopt the Rezoning Plan except for the provisions affecting the Pearl-Cohn, Hillsboro, and Hillwood Clusters. In the end, the Board voted five to four to adopt the Task Force's Rezoning Plan without modifications. The vote on the merits broke down along the same lines as the vote to delay.

The Rezoning Plan went into effect starting with the 2009-10 academic year. Although its long-term effects cannot be fully ascertained at the present time, the available data does permit a provisional assessment of how the Rezoning Plan has addressed several of its stated goals and concerns. With respect to facility under-utilization, which provided the original impetus for the Task Force as well as for previous rezoning efforts, the district court assembled the following data:

| Facility Utilization in MNPS | | | | |
|---|---|---|---|---|
| | 2008-09 | 2009-10 | 2010-11 | 2011-12 |
| Schools > 100% capacity | 38 | 31 | 35 | 40 |
| Schools < 70% capacity | 28 | 22 | 19 | 21 |

*Spurlock*, 2012 WL 3064251, at \*16.

As shown by the above table, the Rezoning Plan made some headway in reducing the number of over-utilized schools during its first year of operation, but the number of over-utilized schools had climbed back up to and beyond its pre-Plan levels by the 2011-12 academic year. The number of under-utilized schools, however, has seen a sustained decline of approximately 25 percent since the Rezoning Plan's implementation. This

indicates that the Rezoning Plan has made material progress on the issue that has been at the forefront of reform efforts for a number of years.

On the academic-performance front, however, the data is far less encouraging. Nashville public schools have a history of poor academic performance. The District failed the No Child Left Behind benchmarks (which measure math and reading ability, as well as graduation and attendance rates) four times between 2003 and 2007, despite the fact that Tennessee's benchmarks rank 46th out of the 50 states in difficulty. These failures conferred on the District the dubious distinction of becoming one of the first two school districts in Tennessee to achieve Corrective Action status under the No Child Left Behind law, mandating state intervention to address the academic problems.

Post-Plan school-performance statistics set forth by the district court show no marked improvement in academic performance in either the Hillwood or Pearl-Cohn Clusters. And the achievement gap between the two clusters continues to persist. *See Spurlock*, 2012 WL 3064251, at *17-21. For example, none of the schools in the largely black Pearl-Cohn Cluster achieved a "good standing" indicator of annual progress in 2011, whereas all but two of the schools in the relatively diverse Hillwood Cluster were in good standing in the same year. *Id.* at *19-20.

Finally, with respect to racial diversity, the picture is mixed. The district court focused only on the enrollment of black students, and did not make the kind of findings with respect to *all* races (including whites, Hispanics, Asian-Americans, and others) that would enable a comprehensive assessment of the Rezoning Plan's effects on racial diversity. *See Parents Involved*, 551 U.S. at 723-24 (cautioning against a binary view of race and a "limited notion of diversity" in the school-policy context). Nor are the statistics emphasized on appeal by the parties particularly helpful because each party cherry picks *absolute* numbers that suit its own purpose rather than showing the post-Plan *change* in racial diversity that is the proper measure of the Plan's effect. Nevertheless, the following table compiled by the district court provides at least some meaningful sense of the Plan's effects, albeit only for the limited category of black student enrollment:

| Percentage of Black Student Enrollment in Different Clusters in the District | | | | |
|---|---|---|---|---|
| | 2008-09 | 2009-10 | 2010-11 | 2011-12 |
| District-wide | 48.0 | 47.5 | 46.6 | 46.0 |
| Antioch | 47.5 | 46.3 | 41.6 | 40.8 |
| Cane Ridge | 41.0 | 44.1 | 44.1 | 43.2 |
| Glencliff | 28.4 | 28.6 | 28.7 | 27.9 |
| Hillsboro | 41.2 | 40.1 | 40.3 | 37.0 |
| Hillwood | 37.5 | 26.4 | 26.1 | 25.5 |
| Hunters Lane | 54.7 | 52.0 | 51.9 | 50.6 |
| Maplewood | 69.8 | 69.7 | 68.2 | 66.1 |
| McGavock | 36.1 | 35.2 | 36.6 | 36.2 |
| Overton | 27.9 | 24.3 | 23.0 | 21.5 |
| Pearl-Cohn | 79.4 | 80.5 | 80.5 | 80.9 |
| Stratford | 69.4 | 69.3 | 68.5 | 67.4 |
| Whites Creek | 76.1 | 79.0 | 78.3 | 78.3 |

*Spurlock*, 2012 WL 3064251, at *16.

As the foregoing table shows, the changes in the vast majority of the clusters are too small or too inconsistent to signify a material trend toward racial isolation. There is, however, a pronounced trend in the Hillwood Cluster, where black student enrollment dropped from pre-Plan levels of 37.5 percent to 25.5 percent in the 2011-12 school year. More detailed findings for the first post-Plan year show a decline in the percentage of black student enrollment in all but one of the schools in the Hillwood Cluster, despite the closure of the only two schools in the cluster that had a majority black student population. *See id.* at *17. In all, 790 fewer black students were enrolled in the Hillwood Cluster schools during the first year after the Rezoning Plan's implementation. *Id.* The decline in the number and percentage of black students attending the relatively diverse and academically superior schools in the Hillwood Cluster is at the heart of the present action.

**B. Procedural background**

This action was initiated by Frances and Jeffrey Spurlock and by Carroll Lewis, respectively the parents and the grandmother of two black children who ended up in allegedly inferior schools after the Rezoning Plan was implemented. The overall gravamen of the complaint is that the Rezoning Plan replaced the noncontiguous-zone students' assignment to a good school with a choice between two bad schools, thereby steering black students away from racially diverse schools in relatively high-income neighborhoods and toward racially isolated schools in low-income neighborhoods.

The Spurlocks' daughter lived with her parents in the Pearl-Cohn Cluster, which was classified as a noncontiguous zone for the Hillwood Cluster under the old student-assignment plan. During the 2008-09 school year, Spurlock attended Bellevue Middle School in the Hillwood Cluster, where she qualified for the honor roll and made a racially diverse group of friends. After the Rezoning Plan went into effect, the District informed Spurlock's parents that she was no longer eligible to attend Bellevue, but could instead attend either John Early Middle School in the Pearl-Cohn Cluster or H.G. Hill Middle School in the Hillwood Cluster, both of which were academically inferior to Bellevue. After a District representative misinformed Spurlock's mother that the family might have to pay for transportation to H.G. Hill out of its own pocket, the family decided to send Spurlock to John Early. Spurlock's experience at John Early was nothing like that at Bellevue. She received no homework assignments, had to share textbooks with a number of other students, and often cried on the way to and from school because she was picked on by her peers.

The Lewis granddaughter also lived in the Pearl-Cohn Cluster. She attended Martha Vaught Middle School in the Hillwood Cluster during the 2008-09 year. After the Rezoning Plan went into effect, Lewis was no longer eligible to attend Martha Vaught, but was given the option of attending Bellevue Middle School in the Hillwood Cluster or John Early Middle School in the Pearl-Cohn Cluster. Bellevue is a good school and the one that Spurlock had attended before the Rezoning Plan's implementation. Lewis's grandmother nevertheless decided to send her to the under-

resourced and academically weak John Early instead, apparently because the grandmother was mistakenly led to believe that it was a magnet school.

Spurlock and Lewis, joined by the Tennessee Alliance for Progress, brought suit in the district court against the Board and a number of related individuals and entities in August 2009, alleging that the Rezoning Plan segregated students by race in violation of the Equal Protection Clause of the United States Constitution. A temporary restraining order was entered the very next day requiring the Board to (1) permit Spurlock's transfer to Bellevue Middle School, and (2) provide textbooks to all sixth-grade students at John Early Middle School. The case was subsequently reassigned to a different district judge, who held hearings for three weeks in November 2009 on a motion for a preliminary injunction. But the court never ruled on the preliminary-injunction motion, and the case was again reassigned after the second judge recused himself.

In April 2012, the court certified a class action on behalf of "all African-American students in the Metropolitan Nashville public school system whose school assignment was affected by the elimination of mandatory noncontiguous transfer zones in the 2008 re-zoning plan." The court subsequently denied the Board's successive motions to dismiss and for summary judgment, and set the case for trial. After an 11-day bench trial in May 2012, the court ruled in favor of the Board for the reasons set forth in its 80-page Findings of Fact and Conclusions of Law. This appeal followed.

## II. ANALYSIS

### A. The district court's analysis and the claims on appeal

The district court analyzed the plaintiffs' equal-protection claim in three steps. First the court found that the Rezoning Plan did not facially classify students by race. *Spurlock*, 2012 WL 3064251, at *24-25. Then it proceeded to examine the question of *de jure* segregation, which requires proof of acts with a segregative purpose that actually result in increased or continued segregation in the public schools. The district court

found that there was a segregative effect, *id.* at \*35, and that the segregative effect resulted from the implementation of the Rezoning Plan, *id.* at \*31-33. But the court nevertheless rejected the *de jure* segregation claim because it found that the plaintiffs had failed to prove that the Board intended to segregate students by race. *Id.* at \*35-43. Finally, the district court held that the Rezoning Plan passes muster under the deferential rational-basis standard because the Plan is rationally related to legitimate governmental interests. *Id.* at \*43-44.

On appeal, the plaintiffs challenge all three steps of the district court's analysis. They first claim that the Rezoning Plan classifies students on the basis of race. Then they argue that the district court erred in finding no intent to segregate. Finally, they contend that even if there were no racial classifications nor an intent to segregate, the Rezoning Plan would still be invalid because it cannot survive rational-basis review.

The Board, by contrast, defends all three parts of the district court's decision. Alternatively, the Board argues that the district court's decision may be upheld on the basis that the Plan did not have an overall segregative effect.

## B. Standard of review

We review the district court's legal conclusions de novo and its factual findings following a bench trial under the clear-error standard. *Kalamazoo River Study Grp. v. Rockwell Int'l Corp.*, 355 F.3d 574, 589 (6th Cir. 2004). Clear error will be found only if we are "left with the definite and firm conviction that a mistake has been committed." *United States v. Canipe*, 569 F.3d 597, 600 (6th Cir. 2009).

## C. Explicit racial classification

The plaintiffs' first argument is that the Rezoning Plan classifies students on the basis of race. Their argument relies on the Supreme Court's opinion in *Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701 (2007), which held that a unitary school district's decision to classify students by race and to rely on that classification in determining school assignments is subject to strict scrutiny. *Id.* at 720-23. The application of strict scrutiny means that an explicit racial classification will be

upheld only if it is "narrowly tailored to achieve a compelling government interest." *Id.* at 720 (internal quotation marks omitted). Applying these principles, the Court struck down as unconstitutional the school policies in Seattle and Louisville that used a student's racial classification (defined as "white" or "nonwhite" in Seattle and "black" or "other" in Louisville) as an important stand-alone factor in determining school assignments and that used a predetermined range of racial enrollment percentages to adjust the racial "balance" in individual schools. *Id.* at 709-17.

*Parents Involved* has no factual similarity to the present case. The plaintiffs have been unable to cite any provision of the Rezoning Plan that classifies students by race or that uses race as a factor in school assignment because there is no such provision. Instead, the Plan classifies students on the basis of geography. The only factor that determines a student's school choices is his or her place of residence, regardless of race. And there is no provision in the Plan that requires a specific "balance" of racial groups in each school or each cluster. So the answer to the question of whether the Plan classifies students by race is a clear "no."

But the plaintiffs resist this simple reading of the Rezoning Plan and urge us to hold that the Plan employs a racial classification because its drafters "made use of detailed racial and ethnic data throughout the process of development." The plaintiffs point out that the Task Force obtained data on the racial breakdown of students attending different schools under the old student-assignment plan, as well as projections of student enrollment by race in the event that various modifications were adopted. They contend that obtaining this data and including some of it in the Rezoning Plan shows that the Plan classifies students by race.

We find the plaintiffs' argument unpersuasive. Racial classification requires more than the *consideration* of racial data. If consideration of racial data were alone sufficient to trigger strict scrutiny, then legislators and other policymakers would be required to blind themselves to the demographic realities of their jurisdictions and the potential demographic consequences of their decisions. The import of the plaintiffs' argument, in other words, is to impose a duty of ignorance on the part of public officials.

Such a requirement would be counterproductive. It would also be impossible to enforce because there is no practical way to monitor and supervise the data that policymakers are permitted to *consider*.

Not surprisingly, the plaintiffs' argument finds no support in the law. The Supreme Court in *Parents Involved* made clear that its prohibition of racial classifications "ha[s] nothing to do" with the use of racial demographic data in policymaking, so long as the policy itself does not classify people by race. *See* 551 U.S. at 745 ("But the examples the dissent mentions—for example, a provision of the No Child Left Behind Act of 2001 that requires States to set measurable objectives to track the achievement of students from major racial and ethnic groups, 20 U.S.C. § 6311(b)(2)(C)(v) (2000 ed., Supp. IV)—have nothing to do with the pertinent issues in these cases."). Justice Kennedy's controlling concurrence put the matter even more directly:

> School boards may pursue the goal of bringing together students of diverse backgrounds and races through other means, including strategic site selection of new schools; drawing attendance zones with general recognition of the demographics of neighborhoods; allocating resources for special programs; recruiting students and faculty in a targeted fashion; and tracking enrollments, performance, and other statistics by race. These mechanisms are race conscious but do not lead to different treatment based on a classification that tells each student he or she is to be defined by race, so it is unlikely any of them would demand strict scrutiny to be found permissible. Executive and legislative branches, which for generations now have considered these types of policies and procedures, should be permitted to employ them with candor and with confidence that a constitutional violation does not occur whenever a decisionmaker considers the impact a given approach might have on students of different races. Assigning to each student a personal designation according to a crude system of individual racial classifications is quite a different matter; and the legal analysis changes accordingly.

*Id.* at 789 (Kennedy, J., concurring) (internal citations omitted). *See also Doe ex rel. Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 548 (3d Cir. 2011) ("The consideration or awareness of race while developing or selecting a policy, however, is not in and of itself a racial classification. . . . Designing a policy 'with racial factors in mind' does not

constitute a racial classification if the policy is facially neutral and is administered in a race-neutral fashion.").

In short, the requirement that legislative classifications be color-blind does not demand demographic ignorance during the policymaking process. One searches in vain for a single pronouncement from any Justice of the Supreme Court, even in dissent, that goes so far as to conclude that the consideration of racial demographic data during the policymaking process amounts to racial classification.

Nor is the Fifth Circuit's per curiam decision in *Lewis v. Ascension Parish School Board*, 662 F.3d 343 (5th Cir. 2011), to the contrary. In that case, the court of appeals overturned the district court's grant of summary judgment in favor of the school board "[b]ecause factual questions exist as to whether [the challenged policy] had both a racially discriminatory motive and a disparate impact." 662 F.3d at 352. This is clearly a holding with respect to the issue of *de jure* segregation, not racial classification. The court nowhere opined that the consideration of demographic data alone amounts to a classification by race.

To be fair, however, certain confusing pronouncements in the *Lewis* per curiam opinion appear to suggest the contrary. *See, e.g.*, *id.* at 350 ("Indeed, it is unclear how a student assignment plan could calculate the percentage of black students at each school *without* classifying *individual* students by race.") (emphases in original). But, as the concurring-and-dissenting opinion in *Lewis* pointed out, this statement lacks clarity. *See id.* at 361 (King, J., concurring in part and dissenting in part). After all, if the court majority had truly believed that there was racial classification at play, it would have ordered the district court on remand to subject the challenged policy to strict scrutiny, which it did not do. In any event, to the extent that certain statements in *Lewis* conflict with Supreme Court precedent, the latter obviously prevails.

The plaintiffs next argue that we should pierce the veil of the Rezoning Plan's ostensible facial neutrality because "[t]he reality is that[,] if anything, streets and addresses in the district's plan serve as surrogates for race." This argument is not

elaborated on, and the only evidence cited to support it is a general citation to the Plan itself, without any specific references.

But to accept the general claim that geography-based school-assignment policies are unconstitutional because they are really nothing more than race-based policies in disguise would mean that any neighborhood-school policy adopted in a community with racially identifiable housing patterns is unconstitutional. Such a far-reaching implication has been repeatedly disavowed by both the Supreme Court and this circuit. *See Freeman v. Pitts*, 503 U.S. 467, 495 (1992) ("Where resegregation is a product not of state action but of private choices, it does not have constitutional implications. It is beyond the authority and beyond the practical ability of the federal courts to try to counteract these kinds of continuous and massive demographic shifts. To attempt such results would require ongoing and never-ending supervision by the courts of school districts simply because they were once *de jure* segregated."); *accord Parents Involved*, 551 U.S. at 721, 736-37; *see also Nat'l Ass'n for the Advancement of Colored People v. Lansing Bd. of Educ.*, 559 F.2d 1042, 1049 (6th Cir. 1977) ("As a matter of general principle, assigning school children to schools in their neighborhoods does not offend the constitution. Racial imbalance in the schools does not, in itself, establish a constitutional violation. The Constitution imposes no duty on school officials to correct segregative conditions resulting from factors over which they have no control, such as residential patterns, and the failure to anticipate the effect on racial composition of the schools of adherence to a neighborhood school policy does not signify that a school board has created a dual system, absent a showing of segregative intent.") (internal citations omitted).

In short, the Rezoning Plan employs no racial classifications in determining a student's school assignment. This conclusion is clear from the face of the Rezoning Plan, and the plaintiffs make no claim that the Plan as actually implemented differs from the Plan as set forth on paper.

**D.  *De jure* segregation**

We next turn to the issue of *de jure* segregation.  To prevail on such a claim, a plaintiff must show "(1) action or inaction by public officials (2) with a segregative purpose (3) which actually results in increased or continued segregation in the public schools." *Lansing Bd. of Educ.*, 559 F.2d at 1046; *see also Keyes v. Sch. Dist. No. 1*, 413 U.S. 189, 205 (1973) (listing the "essential elements of de jure segregation" as "a current condition of segregation resulting from intentional state action").  The district court found that the plaintiffs had succeeded in proving state action resulting in racial segregation, but that their case collapsed because of a failure to prove segregative intent. *Spurlock*, 2012 WL 3064251, at \*43.  This latter finding is contested by the plaintiffs on appeal.  We must review this claim of error in light of the Supreme Court's directive that "the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal." *Hernandez v. New York*, 500 U.S. 352, 364 (1991).

In analyzing the issue of discriminatory intent, the Supreme Court's opinion in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), is instructive.  The Court in *Arlington Heights* reaffirmed that "official action will not be held unconstitutional solely because it results in a racially disproportionate impact," and that "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."  429 U.S. at 264-65.  It then went on to identify the following factors as important "evidentiary source[s]" to consider in the intent inquiry:  "[t]he historical background of the decision[,] . . . particularly if it reveals a series of official actions taken for invidious purposes"; "[t]he specific sequence of events leading up the challenged decision"; "[d]epartures from the normal procedural sequence"; "[s]ubstantive departures[,] . . . particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached"; and the "legislative or administrative history[,] . . . especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports."  *Id.* at 267-68.  The foregoing factors are overlapping and not

exhaustive, *id.* at 268, and "[t]he inquiry is practical," *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 n.24 (1979).

We have carefully reviewed the district court's application of the *Arlington Heights* factors to the present case, *see Spurlock*, 2012 WL 3064251, at *38-43, and find no error, much less clear error. The following evidence supports the district court's finding that there was no segregative intent at play:

- The Rezoning Plan and the process leading to it were the culmination of longstanding official efforts to address the under-utilization problem that had plagued the Nashville public schools for years. And the Plan meaningfully addressed this problem with at least modest success. The present case therefore represents the *opposite* of a "[s]ubstantive departure[]" where "the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached," *Arlington Heights*, 429 U.S. at 267. Rather, the Rezoning Plan shows a substantive continuity of concerns where the factor long considered central by the District strongly favors the result reached.

- The procedure used to arrive at the Rezoning Plan was well-defined, well-regulated, and transparent. Namely, a Task Force representing a diversity of racial, intellectual, and experiential backgrounds was appointed by representatives of various constituencies; its members were free of racial prejudice; its tasks and priorities were clearly and transparently defined; its deliberations were conducted in the open; its process of decisionmaking relied on substantive debates, listening to the concerns of various interested parties, and consulting authoritative Supreme Court opinions; it met with various groups ranging from business interests to community activists; and it was responsive to feedback from various constituencies, including a modification of the Plan in response to suggestions by the NAACP.

- The plaintiffs criticize the fact that the Task Force "was chaired, and very much led, by then-school Board member Mark North, who was appointed by then-chairperson of the Board Marsha Warden and who became a committed advocate of the resulting plan," and that "all the group's decisions were required to be made on a unanimous basis." But this criticism does nothing to prove segregative intent. Similarly, the cursory

allegation that "minutes or other records apparently were not maintained of the task force's deliberations and straw votes" is inconsequential in view of the fact that all regular Task Force meetings were open to the public. Nor is there any persuasive force to the plaintiffs' contention that using the Task Force procedure represents a"[d]eparture[] from the normal procedural sequence" where certain witnesses could recall only one prior instance (in the mid-1990s) of a similar procedure having been used by the Board. There is nothing abnormal or pernicious about the political appointment of apolitical bodies to address significant public-policy concerns. In the federal context, such bodies have included the 9/11 Commission, the Iraq Study Group, and the Financial Crisis Inquiry Commission, to mention only a few well-known examples. Moreover, if the use of the Task Force had been in any way suspicious, one would expect that community voices would have been raised against it at the inception, which the plaintiffs have not alleged.

• Apparently aware of the difficulty of poking holes in the Task Force procedure, and of the absence of any evidence showing that any of the Task Force members harbored discriminatory intentions, the plaintiffs claim that "the intent of the members of the School District's Task Force is immaterial" and that we should instead focus solely on the Board. To be sure, the Board was the body that ultimately decided to adopt and implement the Rezoning Plan, and its intentions are therefore relevant (and will be discussed below). But given the degree of authority and autonomy afforded the Task Force, and the district court's uncontested finding that "the Board essentially rubber-stamped the Task Force's work product," *Spurlock*, 2012 WL 3064251, at *43, the Task Force members' intentions are in fact far from "immaterial."

Nothwithstanding the foregoing indicia of proper intent, the plaintiffs press two arguments in support of their contention that the Rezoning Plan was intended to segregate students by race. They argue, first, that the racial demographic data considered by the Task Force and set forth in the Plan indicates an intent to segregate, and, second, that the disparate impact of the Plan on black students is so pervasive that it cannot be explained by anything other than racial animus. We find neither argument persuasive.

The claim that considering demographic data amounts to segregative intent flies in the face of the Supreme Court's holding that "disparate impact and foreseeable consequences, without more, do not establish a constitutional violation." *Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 464 (1979). As the Court explained in *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256 (1979),

> "[d]iscriminatory purpose" . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group.

*Id.* at 279 (internal citations omitted).

The plaintiffs attempt to circumvent this unfavorable precedent by arguing that "this case is not about 'awareness' or 'consciousness' of racial information, but about embracing and relying on such information and updated projections of same at every step of the plan-drafting process." The distinction urged by the plaintiffs, however, is unconvincing. If what is meant by "embracing and relying" is that policymakers can be *aware* of certain demographic facts but cannot affirmatively *solicit* or *use* them during the policymaking process, such a rule would prove unenforceable because, in the absence of any explicit racial classification or proof of discriminatory intent, the line between "awareness" and "embracing" is almost impossible to draw.

Moreover, such line-drawing would accomplish nothing. The Supreme Court, as previously discussed, has acknowledged that demographic data is used in a variety of legislative and policymaking contexts, and it has made clear that the use of such data, without more, does not offend the Constitution. *See Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 745 (2007); *id.* at 789 (Kennedy, J., concurring). *See also United States v. Hays*, 515 U.S. 737, 745 (1995) ("The record does contain evidence tending to show that the legislature was *aware* of the racial composition of District 5, and of Lincoln Parish. We [have] recognized . . . , however, that the legislature always is *aware* of race when it draws district lines, just as it is aware of age, economic status, religious and political persuasion, and a variety of other demographic

factors.  That sort of race consciousness does not lead inevitably to impermissible race discrimination.") (emphases in original) (quotation marks omitted).  So we squarely reject the purported ban on "embracing" demographic data because it would impose a counterproductive duty of ignorance on the part of public officials and would require judges to undertake impracticable inquiries.

In the present case, there is no proof to justify the inference that the Task Force obtained racial demographic data in furtherance of an intent to segregate the Nashville school system.  The evidence cited by the plaintiffs instead suggests that the Task Force members' intent in considering racial data was to understand the demographic consequences of various potential reforms so as to adopt measures that would have the least possible effect on increasing racial isolation and exacerbating the racial achievement gap.

And that is exactly what they attempted to do.  For example, the Rezoning Plan contains a number of measures specifically designed to address the myriad problems in the racially isolated and socioeconomically deprived Pearl-Cohn Cluster—including more advanced-placement and honors course offerings, lower student-teacher and student-counselor ratios, enhanced pay for teachers, increased technology offerings, the addition of social workers and full-time career and college counselors, and the merging of relatively high-income areas into the Pearl-Cohn Cluster.  Such measures, which were designed to improve the Pearl-Cohn Cluster schools and increase their utilization, undermine the plaintiffs' claim of racial animus.  *See Doe ex rel. Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 553 (3d Cir. 2011) (refusing to find discriminatory intent where certain statements by school-board officials "may indicate awareness or consciousness of race," but "[i]nstead of being adopted for the purpose of discrimination, the statements indicate, if anything, that Board members and Administrators adopted [the] Plan [at issue] in an attempt *not* to discriminate on the basis of race") (emphasis in original).

The plaintiffs also emphasize the testimony of NAACP member Thomas Searcy during the preliminary-injunction hearings.  Searcy testified that when he challenged North by arguing that the Plan would increase racial isolation in certain clusters, "his

reply essentially was that that was a small price to pay for what ultimately was going to be an improvement in the schools; i.e., the schools, though more segregated, would be better." Even assuming that these were in fact North's words, this testimony does not help the plaintiffs. It simply shows that North, while aware that the Plan might increase racial isolation, thought that the benefits of improved academic performance outweighed the potential negative consequences. This is simply a candid expression of a policymaker's cost-benefit judgment. It shows, at most, that North decided in favor of the Plan "in spite of" its effect on racial isolation, not "because of" such an effect. *See Feeney*, 442 U.S. at 279. In light of the firmly established principle that awareness of a disparate impact does not prove an intent to segregate, Searcy's testimony about North's alleged remark is not determinative.

Moreover, unlike other cases where courts have found segregative intent, there is no evidence in the present case that racial demographic data was used to create race-based loopholes and exceptions in an otherwise geographically based scheme. *Cf. Columbus Bd. of Educ.*, 443 U.S. at 461-62, 461 n.8 (noting that black teachers were assigned only to those schools with substantial black student populations and that exceptions were made to an otherwise geographically based neighborhood-school policy to allow white students to avoid predominantly black schools); *Nat'l Ass'n for the Advancement of Colored People v. Lansing Bd. of Educ.*, 559 F.2d 1042, 1050-52 (6th Cir. 1977) (noting that the neighborhood-school policy was subject to a loophole in the form of a "special transfer policy" due to "emotional need," which was used to allow white students living in black neighborhoods to avoid attending predominantly black schools, and that "the Board of Education pursued a practice of disproportionate assignment of minority teachers and administrators to predominantly black schools"). In sum, the inferences that can be drawn from the Task Force's consideration of demographic data undercut, rather than support, a finding of segregative intent.

Finally, the plaintiffs ask us to draw an inference of discriminatory intent from the bare fact of the Rezoning Plan's disparate impact on black students. But disparate impact standing alone, as previously discussed, does not establish a constitutional

violation. *Feeney*, 442 U.S. at 272-73; *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264-65 (1977); *Washington v. Davis*, 426 U.S. 229, 242 (1976). The plaintiffs correctly note, however, that evidence of a policy's disparate impact may be probative in determining whether the policymaker harbored a discriminatory intent. *See Arlington Heights*, 429 U.S. at 266 ("Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. The impact of the official action, whether it bears more heavily on one race than another, may provide an important starting point.") (internal citation and quotation marks omitted); *Washington v. Davis*, 426 U.S. at 242 ("Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution."); *accord Feeney*, 442 U.S. at 274.

Evidence of disparate impact, although relevant, is rarely dispositive. This circuit at one time operated under the rule that "[a] presumption of segregative purpose arises when plaintiffs establish that the natural, probable, and foreseeable result of public officials' action or inaction was an increase or perpetuation of public school segregation." *Oliver v. Mich. State Bd. of Educ.*, 508 F.2d 178, 182 (6th Cir. 1974). But the Supreme Court has specifically rejected the *Oliver* presumption. *See Dayton Bd. of Educ. v. Brinkman*, 443 U.S. 526, 536 n.9 (1979) (referring to *Oliver* and explaining that "[w]e have never held that as a general proposition the foreseeability of segregative consequences makes out a prima facie case of purposeful racial discrimination and shifts the burden of producing evidence to the defendants if they are to escape judgment; and even more clearly there is no warrant in our cases for holding that such foreseeability routinely shifts the burden of persuasion to the defendants").

The Supreme Court's decision in *Arlington Heights* fleshed out the proper role of disparate-impact evidence with regard to the intent inquiry:

> Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face. *Yick Wo v. Hopkins*, 118 U.S. 356 (1886); *Gomillion v. Lightfoot*, 364 U.S. 339 (1960). The evidentiary

> inquiry is then relatively easy. But such cases are rare. Absent a pattern as stark as that in *Gomillion* or *Yick Wo*, impact alone is not determinative, and the Court must look to other evidence.

429 U.S. at 266 (some internal citations omitted). Applying these principles, our task is to determine whether the present case belongs with *Yick Wo* and *Gomillion* in that rare category where the clear pattern of disparate impact cannot be explained except by reference to discriminatory intent, or whether it fits the usual mold where disparate impact alone cannot justify an inference of intent.

*Yick Wo* involved San Francisco ordinances governing the regulation of laundries. The undisputed evidence showed that the ordinances were enforced exclusively against Chinese laundry operators and never against whites, even though there was no difference in the two groups' compliance with legal requirements. 118 U.S. at 374. No reason was proffered for the discriminatory enforcement. *Id.* The Supreme Court held that the lopsided enforcement "is a denial of the equal protection of the laws, and a violation of the fourteenth amendment of the constitution." *Id.*

In *Gomillion*, the complaint alleged that the Alabama legislature transformed "the shape of Tuskegee from a square to an uncouth twenty-eight-sided figure," which served to "remove from the city all save four or five of its 400 Negro voters while not removing a single white voter or resident." 364 U.S. at 340-41. The Supreme Court held that the complaint stated a claim for the violation of the right to vote under the Fifteenth Amendment. *Id.* at 347-48. Justice Whittaker concurred in the result, opining that "the decision should be rested not on the Fifteenth Amendment, but rather on the Equal Protection Clause of the Fourteenth Amendment to the Constitution." *Id.* at 349 (Whittaker, J., concurring).

The present case bears no resemblance to either *Yick Wo* or *Gomillion*. Here, the negative impact of the Rezoning Plan is not so overwhelmingly or suspiciously concentrated upon black citizens as to leave no room for an inference other than segregative intent. To the contrary, the Plan contains numerous provisions *specifically benefitting* the schools in underprivileged neighborhoods heavily populated by blacks.

The district court's uncontested findings further show that there was a significant drop in the percentage of black student enrollment in only one out of twelve geographic clusters, and even there black student enrollment remained at over 25 percent.

Moreover, the defendants in the present case, unlike those in *Yick Wo* and *Gomillion*, have offered a number of plausible nondiscriminatory explanations for their reform efforts, chief among them tackling the school under-utilization problem. The other *Arlington Heights* factors also point away from a finding of segregative intent. So the present case does not come close to being the rare one where segregative intent is shown by disparate impact alone.

Rather, the present case is more like *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256 (1979), which involved an equal-protection challenge to a Massachusetts statute establishing a hiring preference for veterans. The statute "benefit[ted] an overwhelmingly male class," *id.* at 269, an effect so obvious *a priori* that the legislators' foreknowledge of the statute's disparate impact could not be denied, *id.* at 278. Nevertheless, the Supreme Court refused to find an intent to discriminate against women, holding that the statute was intended to benefit veterans, not men, and that it was adopted "in spite of" its disparate impact on women, not "because of" such an impact. *Id.* at 279-80. The present case is analogous in that the Rezoning Plan was intended to ameliorate the school under-utilization problem, not to benefit whites. And to the extent that the Board might have known of the possibility of a disparate impact (a possibility that, unlike in *Feeney*, was by no means inevitable), there is no proof that the Rezoning Plan was adopted "because of" its disparate impact on blacks rather than "in spite" of such an impact.

In sum, the overwhelming weight of the evidence supports the district court's finding that the Rezoning Plan was not adopted or implemented with a segregative intent. The plaintiffs have therefore failed to satisfy the segregative-intent element of a *de jure* segregation claim. We thus have no occasion to address the Board's alternative argument for affirmance on the basis that the Plan's segregative effect was too marginal to be legally cognizable.

**E. Rational-basis review**

Because the Rezoning Plan does not classify students by race and was not adopted with a segregative intent, the Plan is subject to rational-basis review. *See, e.g.*, *Doe ex rel. Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 556 (3d Cir. 2011). Under this standard, "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). "When social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude, and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes." *Id.* (internal citations omitted). Rational-basis review is "highly deferential" and will result in a holding of unconstitutionality "only in rare or exceptional circumstances." *Doe v. Mich. Dep't of State Police*, 490 F.3d 491, 501 (6th Cir. 2007).

In the present case, the Board contends that a number of legitimate state interests are served by the Rezoning Plan. We need address only one—namely, school under-utilization. As discussed above, under-utilization had long been a concern in the District, with many schools operating at levels below what their resources and infrastructure would permit, while other schools were overflowing. The Board's interest in remedying this problem and attaining a more efficient allocation of educational resources indisputably qualifies as a legitimate state interest. And the Rezoning Plan meaningfully addressed the under-utilization problem by, among other things, adjusting school-zone boundaries, redesignating certain schools, recommending school-specific reforms, and allocating more resources to areas with under-utilized schools. These measures not only rationally relate to the under-utilization problem; they actually *solved* the problem in a significant portion of the underutilized schools. This is more than enough to show that the Rezoning Plan passes constitutional muster.

Our conclusion that the Rezoning Plan is constitutional, however, should not be understood to be a judicial endorsement of its "success." As the district court found, the Plan's much-touted neighborhood-school concept "may have thin support in the

academic literature." *Spurlock*, 2012 WL 3064251, at \*44. That equivocal finding is not surprising. After all, the notion that children from underprivileged neighborhoods are somehow better off staying in their woefully deprived neighborhood schools—so woefully deprived that the students at John Early Middle School in the Pearl-Cohn Cluster had to share textbooks—instead of attending manifestly superior outside schools, is counterintuitive.

Nor is there any indication in the record that the Rezoning Plan has done much to alleviate problems other than school under-utilization, despite the Rezoning Plan's efforts to direct more resources into the racially isolated schools in the District. The racial achievement gap apparently exists much as before. Nor has overall academic performance materially changed. Nashville public-school students as a whole were doing poorly before the Plan and continue to do poorly after the Plan. Finally, the effect on racial and socioeconomic diversity, although not dramatic in one direction or the other, appears to have drifted in the direction of increasing isolation.

In the aggregate, then, the Plan seems to have achieved a modest measure of success in improving school utilization while modestly increasing racial isolation. Whether that incremental step forward was worth the incremental step backward is a debatable question. But "the Fourteenth Amendment cannot be made a refuge from ill-advised laws," and "[t]he calculus of effects, the manner in which a particular law reverberates in a society, is a legislative and not a judicial responsibility." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 281, 272 (1979) (ellipsis and quotation marks omitted). In the absence of any constitutional infirmity, it is not the province of the courts to dictate and supervise local school policy.

### III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.